**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-6175-10T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

L.A.,

    Defendant-Appellant.

_____

| |
|---|
| **APPROVED FOR PUBLICATION** |
| **October 8, 2013** |
| **APPELLATE DIVISION** |

Submitted May 21, 2013 — Decided October 8, 2013

Before Judges Messano, Lihotz and Ostrer.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 01-10-1105.

Joseph E. Krakora, Public Defender, attorney for appellant (Steven M. Gilson, Designated Counsel, on the brief).

Andrew C. Carey, Acting Middlesex County Prosecutor, attorney for respondent (Brian D. Gillet, Special Deputy Attorney General/ Acting Assistant Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

OSTRER, J.A.D.

Defendant appeals from the trial court's denial, after remand and an evidentiary hearing, of his petition for post-conviction relief (PCR). See State v. L.A., No. A-4279-07 (App.

Div. May 24, 2010) (L.A. II). The petition was based largely on his trial counsel's failure to interview defendant's wife, D.A., and to call her as an exculpatory witness. We remanded for an evidentiary hearing, at which D.A. would be able to testify, to enable the court to decide whether the failure to call her at defendant's trial constituted ineffective assistance of counsel. Id. at 7. On remand, the trial court found defendant did not meet his burden to prove he was prejudiced by his trial counsel's deficient performance. On appeal, defendant argues the court erred. Having considered the legal arguments in light of the record and applicable law, we agree and reverse.

## I.

A Middlesex County jury convicted defendant in 2003 of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2a; second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4a; and third-degree aggravated sexual contact, N.J.S.A. 2C:14-3a. The victim was his daughter L.N., who was fifteen years old at the time. The indictment charged that each offense occurred on "multiple and diverse dates" between November 1, 2000 and February 28, 2001. The trial evidence pertained to three separate incidents: one in November 2000 at defendant's home in Newark; another at a motel in December 2000 in Sayreville; and a third in defendant's car in February 2001 in

Eatontown.[1]  However, the jury verdict did not specify which, if not all, of the incidents it found to have occurred.  After merger, defendant received a fifteen-year sentence on the first-degree count, subject to Megan's Law registration and lifetime community supervision upon release.  N.J.S.A. 2C:7-1 to -23.  We affirmed the conviction on direct appeal.  State v. L.A., No. A-4071-03 (App. Div. March 17, 2006) (L.A. I), certif. denied, 187 N.J. 81 (2007).

We begin with a review of the trial evidence.  The jury heard testimony from a police officer, L.N., her mother B.N., and defendant.  L.N. lived with B.N. in Monmouth County.  Defendant lived with his wife, D.A., and a son, L.H., in Newark.  During the relevant period, defendant exercised parenting time with L.N., often picking her up and taking her to his home.

L.N. testified that her visitation with defendant was one or two weekends a month before November 2000 and nearly every weekend thereafter.  She also spent part of each summer and some of her school vacations with him at his residence in Newark.  L.N. had a close relationship with L.H., but she did not get along with D.A.

---

[1] The indictment alleged the aggravated sexual assault occurred in Newark "and/or" Sayreville; and the other offenses occurred in Newark, Sayreville, "and/or" Eatontown.

L.N. was a freshman in her local high school, but before the end of 2000, transferred to an alternative school. L.N. testified the behavioral problems that precipitated the transfer resulted from her father's sexual assault.

L.N. testified that on a Sunday in November 2000, defendant picked her up from her home and took her to see a movie, and then to buy a coat. Defendant asked if she wanted to go to his residence to see D.A. and L.H. L.N. replied that she would go if they were home, so they went. The residence was unoccupied when they arrived, and defendant suggested waiting a few minutes before returning L.N. home. L.N. accordingly stayed in the living room for a while and then went into L.H.'s bedroom to sleep. She awakened to discover defendant unbuttoning her pants and pulling them down. He fondled her breasts and vagina and inserted his fingers. She cried and asked what he was doing, but he did not answer. After about twenty minutes, L.N. got dressed, and told defendant that she was "ready to go." He took her home and gave her $60 or $75 in cash.

On Sunday, December 17, 2000, defendant bought L.N. a pair of boots after visiting various shopping malls in Monmouth and Middlesex Counties. In evidence was a sales receipt with a time stamp of 2:39 p.m. They then ate fast food in the car. L.N. testified that she told defendant she was ready to go home, but

defendant said he did not "feel like going that way[,]" and also declined her suggestion to go to his house, adding he did not want to disturb D.A. or L.H. He decided instead to go to a motel in South Amboy, in order to watch the football game that he had mentioned to her earlier. The motel was just off the Garden State Parkway, which was the road that defendant usually traveled for his visitations with L.N. The registration form listed defendant's name, address, and license plate number, along with a check-in time of 3:15 p.m. on December 17, 2000, and a check-out time of 7:46 a.m. the following day.

L.N. testified that after they entered the room, she lay down and slept. She did not notice whether the football game had started. She awoke to find that defendant had pulled her pants partially down. He penetrated her vagina with his fingers and he touched her breasts. Despite her requests that he stop, he turned her face down on the bed and put his penis in her vagina. Her crying ultimately stopped the assault. He got dressed, she said she was "ready to go," and he took her home sometime after nightfall. Defendant gave L.N. between $100 and $160.

L.N. did not want to continue the regular visitations, but B.N. encouraged her because she thought defendant was trying to be a good father. On another Sunday, in February 2001,

defendant picked up L.N. to take her to the movies.  While they were in the car, he fondled her breasts and her vagina through her clothes.  They then saw the movie and he took her home.  Defendant also bought L.N. sneakers that day.

At some point in April 2001, L.N. and B.N. were discussing L.N.'s behavior at school and at home.  B.N. asked her why she was acting withdrawn and disagreeable.  L.N. did not answer, but when B.N. said she would call defendant, L.N. told her that he was "part of the reason" for her behavior.  L.N. then mentioned the sexual assaults.  B.N. called defendant and then took L.N. to the Sayreville police station to give a statement.

L.N. further testified that, before the November 2000 incident, she always had to initiate a visitation with defendant and she had to "beg" for things that she needed, although her father carried significant amounts of cash and drove a Lincoln. Her visitations with defendant had become infrequent during the year or two preceding the November 2000 incident, but thereafter, he called her and saw her frequently and readily gave her money and other items.

Next, B.N. testified.  She described her relationship with defendant.  She stated it lasted ten years, and continued, on and off, until 1996.  Thus, it existed for a time while defendant was married to D.A.  As defense counsel probed the

details of B.N.'s past relationship with defendant, B.N. disclosed that "somewhere in there he went to rehab and to jail."

B.N. testified that defendant's relationship with L.N. was not close before November 2000, and he did not support her materially or emotionally. However, in November 2000, defendant began calling L.N. "a little more," with some calls initiated by him and some by her. That was when L.N. began returning from visitations with clothes, sneakers, or money that defendant provided. B.N. said that L.N. did not have problems with her or in school before November 2000 and that she got good grades. However, after November 2000, L.N.'s grades suffered, and her behavior deteriorated.

Defendant testified on his own behalf. He explained that when L.N. was eleven years old, he established a relationship with her that grew to include regular visitation. He testified that L.N. had a contentious relationship with his wife. He also recalled that L.N. had problems in school before the alleged incident, as he had spoken to school officials about his daughter's difficulties.

Defendant said that he did not expect a visitation on December 17, 2000, because L.N. had not called him in advance to confirm it. She nonetheless called that morning, and he picked

her up. He confirmed that he took her to three shopping centers to find the pair of boots that she wanted and took her to McDonald's. She did not want to go home, so he mentioned his desire to watch the football game. The motel was close to the Garden State Parkway, so he went there. He watched the remainder of the game while she slept. He denied touching her while she was asleep or doing anything inappropriate.

The game ended around nightfall, approximately two to three hours after their arrival at the motel, and defendant returned L.N. to her home. He then went back to the motel to see another football game that was scheduled to start at 8:35 p.m., and he stayed the night.

When asked about the November 2000 and February 2001 incidents, defendant denied L.N.'s allegations. He said that he did not comply with all of L.N.'s requests for gifts or money, and that he maintained that practice in 2000 and 2001. When asked why he did not take L.N. to a sports bar instead of a motel in order to watch the football game, he replied that he had stopped drinking since achieving sobriety and avoided bars.

Defendant recalled buying L.N. a coat on a cold day in late 2000 or early 2001 and then taking her to his home, but he was unsure of the date or month. He was unsure whether they saw a movie that day, because on visitation days he tried to do

whatever she wanted to do. He recalled taking her to his home in Newark, and finding D.A. and L.H. there when he arrived with L.N. On cross-examination, the State highlighted defendant's claim that D.A. and L.H. were present when defendant and L.N. returned to the Newark home after buying her coat. Defendant did not remember whether he gave L.N. money after that visitation, which he sometimes did when he believed she needed it.

After a pretrial Sands[2] hearing, the court denied, on remoteness grounds, the State's application to impeach defendant with prior drug-related convictions. Nonetheless, in view of B.N.'s disclosure, defense counsel elicited further details from defendant about the length of his incarceration. No instruction was requested or delivered regarding the jury's appropriate use of the evidence of defendant's incarceration. Defense counsel also elicited that defendant owed substantial child support and paid only sporadically.

Defense counsel attempted to call D.A. at trial, but the court barred him from doing so because counsel failed to disclose her as a potential witness until after jury selection. Counsel argued that D.A. would testify that L.N. had behavioral problems before the alleged assaults began. Counsel represented

---

[2] State v. Sands, 76 N.J. 127 (1978).

that D.A. had been ill and unavailable to him. On direct appeal, we rejected defendant's argument that the trial judge erred in barring D.A. from testifying. L.A. I, supra, slip op. at 6.

In support of his petition for PCR, defendant asserted his trial attorney was ineffective by failing to interview D.A. or L.H. in advance of trial, and by failing to prepare to call them as witnesses. D.A. certified she was available to be interviewed before trial and counsel falsely stated to the court she was not in order to excuse his own neglect. In addition to discussing L.N.'s prior behavioral issues, D.A. would have testified that the assault in November 2000 could not have occurred, because she was present when L.N. returned to the home with her new coat. Defendant argued that D.A.'s testimony would have generally undermined L.N.'s credibility, and specifically challenged her version of the events of November 2000. Defendant also asserted that his attorney was under the influence of narcotics during the trial, and behaved erratically.

The PCR petition was heard by a new judge. He denied the petition without an evidentiary hearing in an oral decision on November 29, 2007. As we previously noted: "[T]he PCR judge found that defendant had satisfied the first prong of the

Strickland test, namely that counsel was 'deficient' in failing to call [D.A.] as a witness because her testimony 'would have been helpful to put [L.N.]'s credibility in issue . . . .'" L.A. II, supra, slip op. at 7. However, the judge also found no prejudice, stating: "Sure, it might have been error not to call [D.A.] but that is just one of three incidents . . . that defendant allegedly was involved with the victim and that would have been enough to convict him also." We remanded after concluding the court erred "in failing to find that defendant had satisfied the second prong of the test for establishing a prima facie claim of ineffective assistance." Ibid.

Unbeknownst to us in our review of the first PCR appeal, D.A. testified in September 2007 regarding trial counsel's failure to interview her. The hearing was conducted to preserve her testimony because she was in poor health. She was subject to cross-examination. However, neither the parties nor the court referenced the testimony, and a transcript was not provided to us on appeal.

On remand, the court considered the transcript of D.A.'s 2007 testimony, and made credibility findings based thereon. She was hospitalized and too ill to testify on remand. The court also heard testimony from defendant, his trial attorney, and L.H.

D.A. testified in 2007 that L.N. exhibited behavioral problems before the alleged assaults, including school suspensions; she disputed L.N.'s claim that defendant's visitation and support of L.N. was sporadic before the attacks; she described incidents in which L.N.'s veracity was questioned; and she stated that she and L.H. were present the day L.N. visited the home with her new coat.

D.A. described her relationship with L.N. as a stepmother-stepdaughter relationship, which included what she regarded as the expected issues and conflicts. She also stated that there was a gradual change in L.N.'s behavior. She testified that L.N. often blatantly lied about incidents at defendant's house. She cited one occasion when L.N. was disruptive and confrontational in the presence of relatives. Further, she maintained L.N. had problems at school before November 2000, some of which resulted in suspensions. Reinstatement required a parent to go to the school, and B.N. asked defendant to make the visits because she was too tired. The culmination of the suspensions was L.N.'s expulsion and enrollment in an alternative school. Also, before November 2000, B.N. asked defendant to talk to L.N. about problems that L.N. was having with her and "in the community."

D.A. remembered the day in November 2000 when defendant bought L.N. a coat, in part because she recalled making a dinner that included sweet potatoes, and L.N. chided her for failing to remember that she disliked them. D.A. related that she, defendant, and his son occupied only the first floor of the house. It had two bedrooms at the time because the front porch had not yet been enclosed. At some point in the early evening, when she was in the master bedroom watching television, L.N. knocked on the bedroom door and asked if she wanted to see the coat that defendant had bought for her.

D.A. then saw L.N. go to the second bedroom to show the coat to L.H. He stayed there to continue playing his video game, while L.N. hung up the coat and went to the living room to watch television. By that time, D.A. had begun to prepare dinner. She was in the house the entire time that L.N. was there that day, and she insisted that it would have been impossible for anyone to commit a sexual assault anywhere in the home without her being aware of it. The court observed from a diagram that the bedroom doors were opposite one another, affording a clear view from one into the other, and that the bedrooms were separated only by the small bathroom between them and the short hallway between their doors.

D.A. also explained that in the more than two years between arrest and trial, she repeatedly asked defendant why defense counsel did not interview her about the case. Eventually, D.A. stated, her husband told her that trial counsel believed the case involved only L.N. and him — one person's word against the other. However, D.A. explained that on the first day of trial testimony, she had the opportunity to speak to defense counsel and he admitted that he was surprised at how articulate she was. He then attempted, unsuccessfully, to add her to the witness list by misrepresenting why he had failed to name her as a witness earlier.

L.H. also testified that he was present when L.N. arrived with their father at the Newark home, after purchasing her new winter coat. He stated L.N. entered his bedroom to show him the coat, while defendant went into the other bedroom with his wife, and that at no point were L.N. and defendant both in his bedroom.

Defendant supplemented his trial testimony, to cover areas that his trial attorney discouraged him from mentioning. He stated that he gambled on football, and participated in a betting pool at his barber shop. His gambling interest was the reason he was so intent upon seeing the football games on December 17, 2000. Defendant also testified about his trial

14

attorney's erratic behavior; his mood swings; and his lack of communication and preparation.

Defendant's trial counsel conceded he was negligent in not interviewing defendant's son and wife. He admitted that he was a heavy user of heroin, and could not be certain whether it affected his performance. He stated that he was disbarred after defendant's trial. He explained that he failed to perform legal services for clients, but kept their retainers.

The judge initially found D.A. to be a credible witness; however, following his review, he denied relief. Regarding D.A., the judge stated:

> I'm looking at her composure on the stand and I'm starting to think in my mind, would she be a credible witness in the eyes of the jury, and what would they start thinking about? Is she telling them the truth because that is the truth or is she telling the truth because she's telling them — is she saying what she's saying because she's the defendant's wife and she's an interested witness, and I want to make it real clear, I really found her credible. I think this is what made this case so hard.

The judge then appeared to conclude that D.A.'s testimony would have changed the result of the trial, stating:

> I need to make a decision, and this is the decision or the issue. Is there a reasonable probability that if her testimony had been heard by the jury that the outcome of the trial would have been different? Like I said, I found her to be credible. She is sure to provide exculpatory testimony

with regard to one of the three alleged incidences and also to generally discredit [L.N.], if allowed to introduce testimony as to her problematic behavior in school, and this is the struggle that I have.

Assuming that the jury finds her credible and assuming that they believe that the incident at home didn't happen, and that [L.N.] was having problems at school, was there still sufficient evidence to uphold the conviction on the other two incidences? I don't know. I don't believe so. I don't believe so.

However, the judge denied PCR, concluding D.A.'s testimony would not have altered the final outcome. He reasoned:

When I look at that question . . . I can't answer that in the affirmative, that there's a reasonable probability that the outcome would have been different, not when there were other incidences that were part of the case and it's obvious from the verdict that they found [L.N.] to be credible. So, for those reasons, the petition is denied, petition for post-conviction relief is denied.

The court also denied a motion for reconsideration. In a written decision, the court concluded that a jury would likely find L.N. more credible than D.A.

I found [D.A.] generally credible, but I do not believe that her testimony was sufficiently credible to bring the truthfulness of [L.N.'s] testimony into question. Had [D.A.] been placed before a jury to testify, the jury would likely have identified her as an interested witness, as Defendant's wife, and would weigh her testimony as such. Credibility determinations require many factors to be

16

taken into consideration, and to say I find a person generally credible, does not mean I think they are incapable of telling an untruth, or that I necessarily believe everything they say happened as they remember it. When juries are instructed regarding credibility, they are taught that they can believe all of a witness's testimony, some of the testimony, or none of it. [D.A.] was an interested witness. The day in question was not particularly notable, yet [D.A.] supposedly remembered every detail. I do not believe that it is reasonably probable that a jury would have heard [D.A.'s] testimony, weighed it against [L.N.'s], and found [D.A.] to be more credible than [L.N.]. I believe that it is more than reasonably probable that the opposite would have happened, that [L.N.] would have been found to be the more credible of the two and that [D.A.'s] testimony would have been largely discredited by her status as Defendant's wife.

This appeal followed. Challenging the judge's conclusion that it was not reasonably probable D.A.'s testimony would have altered the jury's verdict, defendant argues:

> DEFENDANT'S CONVICTIONS MUST BE REVERSED DUE TO INEFFECTIVE ASSISTANCE OF COUNSEL, IN THAT TRIAL COUNSEL FAILED TO HAVE DEFENDANT'S WIFE TESTIFY AS AN EXCULPATORY WITNESS.

## II.

It is well-settled that to set aside a conviction based upon a claim of ineffective assistance of counsel, a petitioner must prove, by a preponderance of the evidence, that (1) counsel performed deficiently, and made errors so serious that he or she

was not functioning as counsel guaranteed by the Sixth Amendment; and (2) defendant suffered prejudice as a result. Strickland v. Washington, 466 U.S. 668, 687, 694, 104 S. Ct. 2052, 2064, 2068, 80 L. Ed. 2d 674, 693, 698 (1984); State v. Preciose, 129 N.J. 451, 459 (1992) (reciting preponderance of the evidence standard of proof); State v. Fritz, 105 N.J. 42, 58 (1987) (adopting Strickland standard). We have already determined that defendant's trial counsel's performance was deficient. L.A. II, supra, slip op. at 7. Accordingly, our focus here is whether defendant satisfied Strickland's second prejudice prong.

In discussing what constitutes prejudice to a defendant, the Strickland Court reasoned: "The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." Strickland, supra, 466 U.S. at 694, 104 S. Ct. at 2068, 80 L. Ed. 2d at 698. Thus, the Court expressly declined to require a defendant to show "counsel's deficient conduct more likely than not altered the outcome in the case[,]" Id. at 693, 104 S. Ct. at 2068, 80 L. Ed. 2d at 697, holding such an "outcome-determinative standard" imposed too heavy a burden where the attorney's lack of professionalism removes "one of the crucial assurances that

18

the result of the proceeding is reliable."  Id. at 694, 104 S. Ct. at 2068, 80 L. Ed. 2d at 697.

Instead, the Court adopted the now-familiar standard: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694, 104 S. Ct. at 2068, 80 L. Ed. 2d at 698.  The Court made clear that "reasonable probability" is not the same as more likely than not; rather, "reasonable probability is a probability sufficient to undermine confidence in the outcome."  Ibid.  Thus, "[w]hen a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  Id. at 695, 104 S. Ct. at 2068-69, 80 L. Ed. 2d at 698.

In making a prejudice finding, the PCR court must consider "the totality of the evidence before the judge or jury."  Id. at 695, 104 S. Ct. at 2069, 80 L. Ed. 2d at 698.  "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."  Ibid.

The Court also cautioned:  "Most important, in adjudicating a claim of actual ineffectiveness of counsel, a court should keep in mind that the principles we have stated do not establish

mechanical rules."  Id. at 696, 104 S. Ct. at 2069, 80 L. Ed. 2d at 699.  The fundamental guideposts are reliability and fairness.

> Although those principles should guide the process of decision, the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged.  In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.
>
> [Ibid.]

In addressing an ineffective assistance claim based on a counsel's failure to call an absent witness, a PCR court must unavoidably consider whether the absent witness's testimony would address a significant fact in the case, and assess the absent witness's credibility.  See McCauley-Bey v. Delo, 97 F.3d 1104, 1106 (8th Cir. 1996) (stating that the absent witness's credibility "is a part of determining prejudice"), cert. denied, 520 U.S. 1178, 117 S. Ct. 1453, 137 L. Ed. 2d 558 (1997); Commonwealth v. Johnson, 966 A.2d 523, 540 (Pa. 2009) (stating "the predicate Strickland question on a collateral attack requires a judicial assessment of credibility in evaluating prejudice"); cf. State v. Allen, 398 N.J. Super. 247, 258-59 (App. Div. 2008) (stating that trial court must test credibility

of uncalled witness's exculpatory statement on a motion for a new trial on grounds of newly discovered evidence).[3]

However, the assessment of an absent witness's credibility is not an end in itself. Rather, it is a factor in the court's determination whether there is a reasonable probability that, but for the attorney's failure to call the witness, the result would have been different — that is, there would have been reasonable doubt about the defendant's guilt.

We find persuasive the Pennsylvania Supreme Court's discussion of this distinction, succinctly stating:

> We realize, of course, that assessing credibility for purposes of Strickland prejudice is not necessarily the same thing as assessing credibility at a trial. Our research has not revealed any case from this Court or the U.S. Supreme Court that

---

[3] We recognize that Strickland, supra, held the standard for granting a new trial based on newly discovered evidence is "not quite appropriate" as the prejudice test for ineffective assistance of counsel. 466 U.S. at 694, 104 S. Ct. at 2068, 80 L. Ed. 2d at 697.

> Even when the specified attorney error results in the omission of certain evidence, the newly discovered evidence standard is not an apt source from which to draw a prejudice standard for ineffectiveness claims. The high standard for newly discovered evidence claims presupposes that all the essential elements of a presumptively accurate and fair proceeding were present in the proceeding whose result is challenged.
>
> [Ibid.]

specifically sets forth a standard for credibility determinations in the <u>Strickland</u> prejudice context. Logically, however, credibility assessments in the <u>Strickland</u> context are not absolutes, but must be made with an eye to the governing standard of a "reasonable probability" that the outcome of the trial would have been different. Thus, we reject the Commonwealth's suggestion that the PCR[] court "must necessarily find that if the evidence presented at the PCR[] hearing had been presented at trial, it would have been found to be credible by the jury and would have resulted in [appellee's] acquittal." Such a high burden, it seems to us, does not comport with the <u>Strickland</u> reasonable probability standard.

. . . .

In assessing credibility . . . the question for the PCR[] court is not whether the jury in fact would have credited appellee's new evidence and his recast alibi evidence. Instead, the question is whether the nature and quality of the evidence is such that there is a reasonable probability that the jury would have credited it and rendered a more favorable verdict.

[<u>Johnson</u>, <u>supra</u>, 966 <u>A.</u>2d at 541–42 (internal citations omitted).][4]

---

[4] The Sixth Circuit has noted that it is not the PCR court's task to determine whether the absent witness is credible; that is the task of the jury. <u>Avery v. Prelesnik</u>, 548 <u>F.</u>3d 434, 439 (6th Cir. 2008), <u>cert. denied</u>, 558 <u>U.S.</u> 932, 130 <u>S. Ct.</u> 80, 175 <u>L. Ed.</u> 2d 234 (2009). We are persuaded, however, in accord with <u>McCauley-Bey</u>, <u>supra</u>, and <u>Johnson</u>, <u>supra</u>, that the PCR court's consideration of the absent witness's credibility is essential to assess prejudice. Nonetheless, we agree with the Sixth Circuit's view that a court's credibility assessment does not alone "dispose of the issue of prejudice." <u>Ibid.</u> <u>See also</u> 3 Wayne R. LaFave et al., <u>Criminal Procedure</u> § 11.10(d) n. 168 (3d
(continued)

In considering the impact of the absent witness, a court should consider: "(1) the credibility of all witnesses, including the likely impeachment of the uncalled defense witnesses; (2) the interplay of the uncalled witnesses with the actual defense witnesses called; and (3) the strength of the evidence actually presented by the prosecution." McCauley-Bey, supra, 97 F.3d at 1106. All three factors derive from the court's obligation under Strickland to consider the totality of the evidence in making its prejudice determination.

When reviewing a PCR court's determination, we generally defer to the court's factual findings, including credibility determinations, if they are supported by "adequate, substantial and credible evidence." State v. Harris, 181 N.J. 391, 415, 419-20 (2004) (internal quotation marks and citation omitted), cert. denied, 545 U.S. 1145, 125 S. Ct. 2973, 162 L. Ed. 2d 898 (2005). However, we review legal issues de novo. Id. at 419 (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)). Finally, when considering mixed questions of law and fact, we defer to "supported factual findings," but "review de novo the lower court's application of any legal rules to such factual findings." Id. at 416 (citation

_____

(continued)
ed. 2007 & Supp. 2012-2013) (comparing Avery, supra, and Johnson, supra).

A-6175-10T4

omitted); <u>see also</u> <u>State v. Reevey</u>, 417 <u>N.J. Super.</u> 134, 146 (App. Div. 2010), <u>certif. denied</u>, 206 <u>N.J.</u> 64 (2011).

We conclude the PCR judge's analysis incorrectly focused on comparing the relative credibility of D.A. and L.N. The court did not fulfill the <u>Strickland</u> mandate to consider the totality of the circumstances. The court did not address the impact of L.H.'s testimony, or the impact of D.A.'s testimony that L.N. had a history of lying, and that her behavioral issues preceded the alleged assaults. Also, as defense counsel argued below, D.A.'s and L.H.'s absence at trial was particularly harmful, when considering defendant's credibility. He testified they were present in November 2000, specifically contradicting L.N. The State highlighted defendant's assertion. Surely his son and wife would have corroborated defendant's testimony, if defendant had been telling the truth. In other words, D.A.'s and L.H.'s testimony would not only tend to undermine L.N.'s credibility, it would have bolstered defendant's.[5]

The court also erred by relying on the jury's apparent finding that L.N. was credible, because it voted to convict.

---

[5] Defendant does not base his ineffective assistance claim on his trial counsel's performance eliciting defendant's incarceration record and child support arrears, and failing to seek appropriate jury instructions on the subjects. Nonetheless, the evidence may have portrayed defendant in a negative light. Consequently, D.A.'s and L.H.'s testimony may also have helped to counter the effect of that negative impression.

The court noted that there were two other incidents, implying that D.A. could not directly challenge L.N.'s testimony with respect to those. However, the jury's credibility findings in the trial beg the question whether the jury would have found reasonable doubt had it heard from the absent witnesses. D.A.'s and L.H.'s testimony about the November incident, and D.A.'s testimony about L.N.'s behavioral issues and past lying, if believed, could raise questions about L.N.'s credibility in general, which would affect her credibility as to the December 2000 and February 2001 incidents. The PCR judge was hampered by the fact that he did not preside over the trial, and could not personally assess L.N.'s credibility.

We determine that the judge, in denying defendant's motion for reconsideration, answered the wrong question. The issue was not whether L.N. was more credible, or more likely to be believed, than D.A. The issue was whether there was a reasonable probability — that is, a probability sufficient to undermine confidence in the outcome — that the jury would have found reasonable doubt about defendant's guilt, had it heard from the absent witnesses. A jury may well have determined that L.N. was more credible than D.A., but that would not necessarily be enough to convict. The jury would have had to believe L.N. beyond a reasonable doubt, notwithstanding the apparently

credible testimony of D.A., the testimony of L.H., and the now-corroborated testimony of defendant. Although the trial court accurately recited the Strickland test in its initial decision, we are convinced it was not properly applied, particularly since, on reconsideration, the court deemed decisive its comparison of L.N.'s and D.A.'s credibility.

We exercise de novo review of the legal aspects of the mixed questions of law and fact, and base our review on the trial record, and the PCR court's determination that D.A. appeared to be a credible, albeit interested witness. We conclude it was reasonably probable that the jury would have had reasonable doubt about defendant's guilt. We need not address whether it was more likely than not that a jury would have acquitted. We reach our conclusion mindful of the guidance in Strickland that "the ultimate focus of our inquiry must be on the fundamental fairness of the proceeding whose result is being challenged" and whether "the result . . . is unreliable" because of counsel's failures. Strickland, supra, 466 U.S. at 696, 104 S. Ct. at 2069, 80 L. Ed. 2d at 699.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION