**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-0716-17T3
               A-0719-17T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

KEVIN BAKER and SEAN
WASHINGTON,

    Defendants-Appellants.

_____

> Argued October 7, 2019 – Decided December 26, 2019
>
> Before Judges Sabatino, Geiger and Natali.
>
> On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 95-08-1950.
>
> Lesley C. Risinger and Lawrence S. Lustberg argued the cause for appellants (Last Resort Exoneration Project Seton Hall University Law School, attorneys for Kevin Baker; Gibbons PC, attorneys for Sean Washington; Lesley C. Risinger, D. Michael Risinger, Lawrence S. Lustberg, and J. David Pollock, on the joint briefs).

Natalie A. Schmid Drummond, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Jill S. Mayer, Acting Camden County Prosecutor, attorney; Natalie A. Schmid Drummond, of counsel and on the briefs).

Frank Muroski, Deputy Attorney General, argued the cause for amicus curiae Office of the Attorney General (Gurbir S. Grewal, Attorney General, attorney; Sarah Lichter, Deputy Attorney General, of counsel and on the brief).

Raymond M. Brown argued the cause for amici curiae Askia Jabir Nash, Rodney Roberts, David Shephard, and Anthony Ways (Greenbaum, Rowe, Smith & Davis, LLP, attorneys; Raymond M. Brown, of counsel and on the brief; Stephanie Reckord and Robert J. Flanagan, III, on the brief).

Linda Mehling argued the cause for amici curiae Innocence Project, Exoneration Initiative, and Innocence Network (Frank R. Krack and Linda Mehling, on the brief).

PER CURIAM

After a two-day jury trial in 1996, defendants Kevin Baker and Sean Washington were found guilty of murdering two victims who had been shot to death outside of a Camden housing project. The State's case hinged upon the testimony of a sole eyewitness, a drug addict who claimed she had seen the shooting and saw defendants running from the scene. Defendants' convictions were upheld on direct appeal and in ensuing collateral proceedings.

A-0716-17T3

With the assistance of pro bono counsel and innocence organizations, defendants filed new petitions for post-conviction relief ("PCR"), alleging actual innocence, ineffective assistance of trial counsel, and prosecutorial suppression of material evidence. They also moved for a new trial based upon newly discovered evidence, including forensic expert proof utilizing scientific techniques that did not exist or were not widely available at the time of their trial. After a lengthy evidentiary hearing, the judge who had presided over the trial rejected defendants' petitions and motions.

For reasons detailed in this opinion, we reverse the trial court's denial of relief and grant defendants a new trial. We do so mainly because of the newly discovered forensic evidence that powerfully undermines the sole eyewitness's varying descriptions of the shooting, coupled with non-forensic exculpatory proof of a 9-1-1 recording the defense obtained many years after the trial.

Viewed objectively, that material evidence, if it had been presented, probably would have changed the jury's verdict. The additional proof calls into serious question whether defendants' guilt was established beyond a reasonable doubt. The circumstances were "clearly capable of producing an unjust result." R. 2:10-2. We do not, however, declare defendants to be "actually innocent,"

3

but instead provide the State with the option of pursuing a second trial, mindful

of the lengthy intervening passage of time.

TABLE OF CONTENTS

I. Facts and Procedural History ........................................................................5

    A. Indictment and Trial ..........................................................................5

    B.  Verdict and Sentencing ..................................................................15

    C. Washington's Appeal ........................................................................16

    D. Washington's First PCR Petition ......................................................16

    E. Washington's Federal Petition for a Writ of Habeas Corpus and Second PCR Petition ...................................................................................19

    F. Baker's Appeal and First PCR Petition .............................................19

    G.  Baker's Habeas Petition and Second PCR Petition ............................23

    H. Defendants' Current PCR Petitions and Motions for a New Trial .........24

        1. Baker's Filing and Litigation Regarding Redden's Deposition ...........24

        2. Testimony of Forensic Witnesses .................................................24

        3. Washington's Filings and Motion Practice .......................................31

        4. Fact Witnesses ..........................................................................32

            a. Washington's Testimony and Supporting Witnesses ......................32

            b. Baker's Testimony and Supporting Witnesses ..............................41

        5. Other Evidence ..........................................................................48

    I. The PCR Court's Decision ................................................................48

    J. Defendants' Appeals ........................................................................49

II. Overall Legal Standards ...........................................................................50

    A. PCR ..............................................................................................51

    B. New Trial Motions ..........................................................................52

III. The Newly Discovered Evidence ..............................................................57

    A. Forensic Evidence ..........................................................................57

    B. Proof of Washington's Identity As the 9-1-1 Caller ............................68

A-0716-17T3

C. The Other Non-Forensic Proofs ............................................................. 71

IV. Impact of the Additional Proofs ............................................................. 72

V. Ineffective Counsel Claims ..................................................................... 74

VI. Brady v. Maryland Issues ...................................................................... 78

VII. Remaining Points ................................................................................. 79

VIII. Conclusion........................................................................................... 80

I.

(Facts and Procedural History)

Because of the significant issues at stake, we discuss the facts and procedural history in extensive detail.

A. Indictment and Trial

In 1995, a Camden County Grand Jury charged defendants Baker and Washington in Indictment No. 95-08-1950 with the following offenses: conspiracy to commit first-degree murder, N.J.S.A. 2C:5-2 (count one); two counts of first-degree murder, N.J.S.A. 2C:11-3(a) (counts two and three); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count four); third-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (count five); and second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7 (counts six and seven).

The parties tried the case before a jury in July 1996. Baker was

represented by Frederick L. Gumminger from the Office of the Public Defender, and Washington was represented by private counsel, Michael W. Kahn. The State called six witnesses during the two-day trial. Defendants did not call any witnesses.

The prosecutor, in his opening, called it "a one-witness case" and said that the "evidence is going to come from the testimony of Denise Rand principally." After opening statements, the court held a Wade[1] hearing to consider the reliability of Rand's identification of defendants as the perpetrators. She testified at the hearing that she knew Washington "since he was little." She testified she knew Baker for five or six years, although she previously said, in her statement to investigator Harry Glemser of the Camden County Prosecutor's Office a few days after the murders, that she knew Baker for two years, and gave further inconsistent answers in her trial testimony.

The court ruled after the Wade hearing that the State proved by clear and convincing evidence that Rand's in-court identification of defendants was not the result of a suggestive out-of-court identification, because Rand knew both defendants before the murders and there was not a substantial likelihood of misidentification.

---

[1] United States v. Wade, 388 U.S. 218 (1967).

A-0716-17T3

At trial, Rand testified that she was at Roosevelt Manor, a housing project in Camden, in the early morning hours of January 28, 1995, and witnessed the murders. She claimed she saw victim Margaret Wilson, who was known as "Murph," and victim Rodney Turner, who was known as "Rock," when they were shot and "they dropped" to the ground. According to Rand, she heard "two or three shots" and had "seen two" shots before defendants ran past her.

Rand claimed she knew that defendants shot Wilson and Turner "because [defendants were the] only two that ran past me." She recalled she saw both Baker's and Washington's faces, and she had no doubt in her identification of them. Rand did not know if defendants saw her that morning, and could not recall what they were wearing.

Rand, who sometimes wore glasses, vacillated on many aspects of her narrative. She first said that she saw one of the defendants with a gun in his hand, but could not remember which one. Later, she testified that she only saw Baker with a gun in his hand, not Washington. The prosecutor attempted to use Rand's police interview with Glemser to refresh her recollection, and after reading a portion of the transcript, Rand initially said that both defendants had guns. She later said that she only saw a gun in Washington's hand and could not recall if Baker had a weapon.

7

When confronted with the portion of transcript in which Rand told Glemser she was not paying attention to see if defendants had weapons when they ran past her, she responded that she "was standing there" and "just had to be paying attention." She explained that her response to Glemser that she was not paying attention "was the answer at the time." She acknowledged, however, that she "wasn't paying no attention."

Rand could not recall which defendant shot Turner, and which one shot Wilson. She continued reading from the transcript of her police interview that she saw Turner "get shot first" and that "K.B." shot him.[2] Rand stated that the transcript refreshed her recollection, but initially testified that she could not recall seeing "K.B." shoot Turner, before later saying she remembered seeing "K.B." shoot Turner in the head. She testified that Washington shot Wilson. When asked "how close together" the shootings were, Rand responded that "[t]hey lay right next to each other."[3]

After the shooting, Rand went and got Turner's wife, Sandra Turner. By

_____

[2] At the evidentiary hearing, Baker acknowledged that people referred to him as "K.B."

[3] In context, the prosecutor's question appears to be asking how much time elapsed between the two shootings, but Rand interpreted it instead as asking about the physical distance separating the two victims.

A-0716-17T3

the time Rand returned to the scene the police had arrived.

Rand admitted that she had gone to Roosevelt Manor to buy drugs, that she had smoked "ready rock" crack cocaine approximately two hours before the shootings, and that at the time she smoked crack every two to three hours. Although she admitted being under the influence at the time of the murders, she claimed she was "not to the point where I don't know what I'm seeing."

Rand agreed that the sun had not yet risen at the time of the shootings, before 6:00 a.m. in January 1995, and that it was "still basically nighttime," but also confusingly said "it was dark, but it was light" and "it wasn't that dark." She was standing on the curb of Phillip Street and the shooting occurred in the courtyard halfway between Phillip Street and 8th Street.[4]  According to Rand, defendants ran past her and then down Phillip Street towards Ferry Avenue.

When asked who she was with at the time, Rand initially answered that it was "none of your business," before saying that she was accompanied by her cousin, Tyrone Moore.  She testified that he was walking a few feet behind her at the time of the shootings.  She was confronted, however, with the police interview in which she told Glemser that Moore was walking in front of her.

_____

[4]  The maps in defendants' appendix referred to the street as both "Phillip" and "Phillips."

She then confusingly said that Moore was "in front of me, behind me, he was there" and repeated that he was in "[f]ront of me, behind me." After saying she did not remember where Moore was in relation to her, she said, "I turned around, he was gone." She initially was unsure whether that was before or after the shots were fired, but later said she was sure it was after they were fired.

Rand testified that she knew Washington "for a long time" meaning "since he was little." She did not know Baker for "that long," but estimated she knew him for "some years." On cross-examination, Rand admitted telling Glemser that she knew Baker for two years and testifying at the Wade hearing that she knew Baker for five years, before stating that she could not recall how long she knew Baker.

None of the State's other trial witnesses observed the shooting. Detective Fred Jefferson of the City of Camden Police Department testified that he was a patrol officer at the time of the murders and was dispatched to Roosevelt Manor at 5:57 a.m. He arrived approximately three to five minutes later and confirmed that it was still dark and also "very cold" at that time. Jefferson saw two bodies in the courtyard of the complex, one laying "semi-fetal" and the other "flat on their [sic] stomach." He secured the scene and located empty casings from a nine-millimeter (mm) semi-automatic weapon. Jefferson said Turner's father

10

came to the crime scene.

Investigator Michael Corbin of the Camden County Prosecutor's Office received a pager notification at 6:11 a.m. on the morning of the murders, when it was still dark outside. He arrived at Roosevelt Manor at 7:05 a.m. Corbin testified that the distance from Phillip Street, where Rand said she was standing, to Turner's and Wilson's bodies, was approximately ninety feet. At the scene, Corbin collected three cartridge cases with "a head stamp of SB 9 millimeter Luger." He assumed the projectiles within those casings were fired from an automatic weapon. Neither Jefferson nor Corbin were aware of anyone claiming to be an eyewitness while they were at the crime scene.

Sergeant John Jacobs, the unit supervisor of the New Jersey State Police ballistics unit at the time of the murders, was qualified in the State's case as an expert in ballistics and firearms. Jacobs explained that all three of the discharged shells were nine-millimeter caliber and manufactured by "Squires Bighams."[5] He examined the discharged shells and determined that they were all fired from the same firearm, but was unable to determine the particular firearm involved, although it would have been a "9 millimeter Luger caliber

---

[5] The transcript says "Squires Bighams," but the correct name may be Squires Bingham.

type."

Jacobs was unable to determine if the shells were discharged from a revolver or an automatic weapon, although he recognized that an automatic weapon would eject the discharged shells when it was fired, whereas a person would have to manually remove the shells from a revolver. He could not discern the "lands and grooves" on the two bullets recovered from Wilson's clothing due to their "mutilated condition." Thus, he was unable to determine if the bullets were fired from the same gun as the discharged shells, or to say definitively how many guns were used in the murders.

George Hickman from the State Police crime laboratory was presented as an expert in trace evidence analysis. Hickman testified that gun powder and lead were detected in the area around the two bullet holes in Wilson's white knit hat, which indicated "a relatively close shot."

Dr. Robert Segal, the Camden County Medical Examiner, performed the autopsies on Turner and Wilson. Dr. Segal was qualified as an expert witness in forensic pathology and wound ballistics. He opined that Turner died from a bullet fired from within a half-inch of his head, entering behind his left ear, and exiting behind his right ear. Wilson, meanwhile, died from two gunshot wounds to her head and a "relatively minor" gunshot wound to her left arm. Two bullets

A-0716-17T3

entered the right side of her head above her ear and exited on the left side of her face, one near the corner of her mouth and the other near the corner of her eye. There was also a "single through and through" bullet wound to her left arm.

Dr. Segal was unable to determine if Wilson was shot two or three times, because the wound to her left arm could have been a continuation wound from one of the bullets that exited the left side of her face. He testified "[t]here is no way to tell whether this bullet passing through the arm was related to either of these two [head] wounds or was a third wound."

At the time of trial, Baker had two prior indictable convictions: a January 1991 fourth-degree aggravated assault for pointing a firearm at another person and a January 1993 possession of cocaine with intent to distribute within 1000 feet of school property. Washington had four prior convictions for third-degree possession of a controlled dangerous substance, two from July 1990, and two from March 1992. The State moved to use defendants' prior convictions to impeach their credibility, if they testified. The court granted the State's motion, but ordered the convictions sanitized to include only the degree of the crime, the date of conviction, and the sentence imposed. Following that ruling, neither defendant testified at trial.

Tyrone Moore, Rand's cousin was with her at the time of the murders and

13

told police that they were blocks away and that Rand could not have seen the shootings. He was listed as a potential defense witness and prepared to testify. So was Baker's girlfriend, Michelle Redden, who maintained that she was with Baker at the time of the shootings. Neither was called to testify, however, as defendants did not offer any evidence on their behalf.

During summations, the court prevented defense counsel from suggesting that Moore may have killed Turner and Wilson. After their own closing arguments, both defense attorneys moved for a mistrial because the prosecutor repeatedly and loudly interrupted them. The court denied the motions. The following day, before jury instructions, both defense attorneys again moved for a mistrial, arguing, in part, that the court's ruling preventing them from suggesting that Moore might have been the murderer violated defendants' rights. The court also denied those motions. The defense attorneys then moved for a judgment of acquittal, which the court denied.

The court did not instruct the jury on the lesser-included offenses of aggravated manslaughter and manslaughter because "the only evidence as to what allegedly occurred is the testimony of [Rand] who indicated she saw the defendants basically walk up behind the victims, point a gun and shoot the two victims in the head and flee."

B. <u>Verdict and Sentencing</u>

The jury convicted defendants of two counts of first-degree murder, conspiracy to commit murder, and possession of a weapon for an unlawful purpose. It acquitted defendants of unlawful possession of a weapon.

Both defendants moved for judgment notwithstanding the verdict, which the court denied. Defendants were then tried on the certain persons not to have weapons charges, but the jury could not reach a verdict, the court declared a mistrial, and those charges were dismissed on the prosecutor's motion.

On September 20, 1996, after merging the other convictions into the murder convictions, the court sentenced each defendant to two consecutive terms of life imprisonment, each with a thirty-year period of parole ineligibility, for an aggregate sentence of life in prison with a sixty-year parole ineligibility period. At sentencing, the court remarked that both defense attorneys had made tactical decisions not to call any witnesses, including at least one witness who was present in the courthouse, because they apparently thought Rand was not a credible witness and the jury would not believe her.

Defendants filed motions for a new trial, but withdrew those motions after filing their notices of appeal. On November 21, 1996, the court nonetheless issued written findings of fact and conclusions of law regarding defendants'

A-0716-17T3

motions pursuant to Rule 2:5-1(b).

C. Washington's Appeal

In March 1999, this court affirmed Washington's convictions and sentence. State v. Washington, No. 3943-96 (App. Div. March 17, 1999). The panel added that "[a]s to [his] alibi contention, . . . we express no view as to its merit, leaving it for post-conviction review." The Supreme Court denied Washington's petition for certification. State v. Washington, 161 N.J. 150 (1999).

D. Washington's First PCR Petition

In January 2000, Washington filed a pro se PCR petition, alleging ineffective assistance of counsel for failure to call witnesses, including Moore, Redden, and his nephew, Dwight Collins. In November 2000, after hearing argument from Washington's appointed counsel, John Havrilchak, the trial court denied the petition.

After Washington appealed, we remanded for the trial court to determine whether Washington's trial counsel was ineffective for failing to call Collins as a witness. State v. Washington, No. A-3140-00 (App. Div. June 27, 2002). We specifically directed the trial court to hold an evidentiary hearing and assess Collins's credibility.

16

On March 25, 2003, the trial court held a hearing in which Collins testified that Washington was cooking chicken at Collins's mother's house on the morning of the murders at approximately 5:00 a.m. According to Collins, around 6:00 a.m., Washington left to make a call from the pay phone near the intersection of Eighth Street and Central Avenue, which was about a one-minute walk from where the bodies were found, because Washington did not want to use the phone in Collins's mother's house. Collins said that Washington may not have wanted to use his mother's phone because he was selling drugs, or, alternatively, because he was calling someone out of the local area and his mother's phone service was supposedly limited to local calls.

Washington returned approximately five to seven minutes later, "very emotional" and "crying." Washington told Collins that he saw two people laying on the ground, and that he thought one of them was Collins's brother Darnell Wheeler (who was also Washington's nephew), because Wheeler had a similar jacket. According to Collins, Washington then called 9-1-1 from Collins's mother's phone.

Collins testified that Baker and Washington knew each other, but were not close friends, and that he had never seen them "hang out together." Collins confirmed that if he had been called at trial, he would have testified on

A-0716-17T3

Washington's behalf.

After observing Collins's testimony at the March 2003 evidentiary hearing, the court found he was not credible because was a convicted felon who admitted to using false identification documents.[6] The court also found he was biased because he was Washington's nephew. It further found that Collins's testimony placed Washington close to the location of the shootings at the approximate time they occurred.

The court concluded Collins's testimony would not have affected the outcome of the trial and denied Washington's PCR petition. Washington then moved to reopen the PCR proceedings to present additional evidence, but the court denied the motion.

In November 2005, we affirmed the PCR court's denial of Washington's petition. State v. Washington, A-4730-02 (App. Div. Nov. 9, 2005). In February 2006, the Supreme Court denied his petition for certification. State v. Washington, 186 N.J. 255 (2006). Justice Long and Justice Albin added a separate statement in which they "note[d] that in their view, the Court's [order] does not preclude defendant from bringing a further petition for post-conviction

---

[6] Although Collins had a criminal record at the time he testified at Washington's PCR hearing, he did not have one at the time of Washington's trial.

A-0716-17T3

relief in respect of witness-related issues that were not fully considered by the trial court or the Appellate Division on the merit." State v. Washington, 189 N.J. 640 (2006).

E. Washington's Federal Petition for a Writ of Habeas Corpus and Second PCR Petition

Washington thereafter filed a pro se petition for a writ of habeas corpus (habeas petition) in federal district court, but later withdrew it without prejudice so that he could file a second PCR petition in state court. Washington v. Ricci, 631 F. Supp. 2d 511, 515 (D.N.J. 2008). He then filed a pro se PCR petition and motion for a new trial, both of which the trial court denied on November 28, 2007.

Washington reinstated his federal habeas petition, which the federal district judge dismissed with prejudice on September 29, 2008. Ricci, 631 F. Supp. 2d at 513, 528. The district court also denied Washington a certificate of appealability ("COA"). Ibid. On May 13, 2009, the United States Court of Appeals for the Third Circuit denied Washington's application for a COA.

F. Baker's Appeal and First PCR Petition

In February 1998, we affirmed Baker's convictions and sentence on direct appeal. State v. Baker, No. A-1143-96 (App. Div. Feb. 23, 1998). We specifically rejected Baker's claim that his trial counsel was ineffective for

19

failing to obtain expert witnesses to testify about eyewitness identification and the effects of crack-cocaine. We also rejected Baker's argument that prosecutorial misconduct required reversal of his convictions, although we chastised the prosecutor's behavior as "loud, boorish and rude" and referred the matter to the Camden County Prosecutor.

In May 1999, Baker, represented by Edward J. Crisonino, filed a PCR petition alleging ineffective assistance of trial counsel. One of the issues raised in Baker's PCR petition was that his trial attorney Gumminger was ineffective for failing to call several witnesses, including Redden, Moore, and Latasha Langston.[7]

The trial court concluded that Gumminger was not ineffective and that his decision "not to call witnesses was a strategic move based upon the decision at that time that the witness called by the State was not credible and the jury would not believe her."

On October 29, 1999, the trial court held an evidentiary hearing and heard testimony from Baker and Gumminger regarding Baker's contentions that Gumminger did not meet with him enough prior to trial and also incorrectly told him he could not testify because the jury would hear his unsanitized criminal

---

[7] Langston's first name is spelled "Latesha" in some transcripts.

record.

Gumminger clarified at the outset of his PCR testimony that he did not "have [his] file with [him]" and was testifying based solely on his memory. He thought he met with Baker four to six times prior to trial. He advised Baker not to testify, but in the end it was Baker's decision, although Gumminger could not recall if he told Baker that his prior record would have been sanitized at trial.

Gumminger confirmed that Redden was present in the courthouse during the trial and prepared to testify. Gumminger explained he did not call her because, based on her "general demeanor," she "would not have come across as a truthful witness." According to Gumminger, Redden claimed that she was watching a television program featuring Larry Kane[8] with Baker at the time of the murders. He decided not to call her as a witness because the prosecutor was prepared to call witnesses from the television station to "contradict the timing, and maybe even the existence of this television show." Gumminger said that his primary concern in advising Baker not to testify was not Baker's prior record, but instead that the "phantom television show" created a risk that "the alibi would have blown up and would have caused more problems than it would have helped." Gumminger believed that Redden "was profoundly afflicted with

---

[8] The transcript incorrectly refers to "Larry King."

credibility problems."

After hearing Gumminger's PCR testimony, the court denied Baker relief on his claims. The court found that Gumminger met with Baker prior to trial and made a justifiable strategic decision not to call Redden to testify, because he believed she was not credible and the alibi testimony would be contradicted by the State's evidence. The court also found that Baker made the ultimate decision not to testify.

In March 2001, we remanded the matter to the trial court to allow Baker to develop and pursue his claim that trial counsel was ineffective for failing to investigate and present evidence that Washington was the "lone gunman." State v. Baker, No. A-1543-99 (App. Div. March 15, 2001). We instructed that "[o]n remand, the judge may set time limitations and other conditions to assure a fair and expeditious final determination of the merits of [Baker's] claim."

On remand, Baker submitted an affidavit from Langston. Baker also furnished an investigative report recounting an interview with Collins, who alleged that he was with Washington around the time of the murders. The trial court found that Baker failed to prove that his trial counsel was deficient or that there was a reasonable probability that the outcome of his trial would have been different, and denied his PCR petition.

22

In November 2003, we affirmed the denial of Baker's PCR petition, without prejudice to him filing a subsequent petition arguing that his PCR counsel was ineffective. State v. Baker, No. A-3759-01 (App. Div. Nov. 14, 2003). In February 2004, the Supreme Court denied Baker's petition for certification. State v. Baker, 179 N.J. 312 (2004).

G. Baker's Habeas Petition and Second PCR Petition

In December 2004, Baker filed a habeas petition in federal district court alleging ineffective assistance of counsel. On September 26, 2005, Judge Jerome B. Simandle denied Baker's petition. Judge Simandle noted, however, that Baker had not exhausted his claim that PCR counsel was ineffective and could still raise that issue in a subsequent PCR petition in state court. According to the State's brief, both Judge Simandle and the United States Court of Appeals for the Third Circuit denied Baker's application for a COA, but those orders are not included in the parties' appendices.

In May 2007, Baker, now represented by Louis H. Miron, filed another PCR petition, alleging ineffective assistance of PCR counsel, but later withdrew that petition and did not refile it.

H. Defendants' Current PCR Petitions and Motions for a New Trial

1. Baker's Filing and Litigation Regarding Redden's Deposition

In January 2013, Baker filed the instant PCR petition and motion for a new trial. Before filing his petition and motion, Baker unsuccessfully sought a court order, first in the Civil Part and then in the Criminal Part, that would permit him to take a de bene esse deposition of Redden because she was suffering from stage-four terminal breast cancer. We affirmed both the Civil Part's and Criminal Part's denials of Baker's application, but added that "in light of defendant's additional filings, the criminal court must reconsider defendant's application to compel Ms. Redden's testimony at either a deposition or an evidentiary hearing." In re Petition of Baker, Nos. A-3754-11 and A-4368-11 (App. Div. April 30, 2013). Redden died before she was deposed.

2. Testimony of Forensic Witnesses

The trial court heard testimony from defendants' forensic witnesses in support of Baker's motion for a new trial before deciding whether to grant an evidentiary hearing.[9]

---

[9] The testimony of the forensic witnesses occurred before Washington filed his PCR petition and motion for a new trial. The forensic witnesses did not testify a second time, and the PCR court considered their testimony in connection with both Baker's and Washington's claims.

A-0716-17T3

Dr. Michael Baden, who was certified as an expert in forensic pathology, testified on November 12, 2013. Dr. Baden concluded that Turner had been shot once from close range on the left side of his head while his head was positioned upright. He estimated that Turner had been dead for at least fifteen minutes before the emergency medical technicians ("EMTs") arrived based on their observations about blood coagulation and the temperature of the body.

Dr. Baden concluded that only two bullets struck Wilson, based on the following facts: (1) the entry and exit wounds in Wilson's head lined up with the wounds on her arm; (2) the wounds to her arm were superficial perforations that did not go all the way through her arm or connect to each other; and (3) the bullets were found in her clothing. He further testified that Wilson was shot while lying on the ground with her left arm raised against her head, because the bullet tracts were nearly parallel, which indicated that Wilson was not moving at the time she was shot. In addition, if she had been upright when she was shot, her body would not have fallen in the position it was found, and she would have had blood dripping down her body. On cross-examination, Dr. Baden acknowledged it was possible that Wilson was shot while standing upright, but said it was "so unlikely that I would fault such a diagnosis." On redirect, he stated he was "[m]ore than 95 percent certain" that Wilson was shot while she

25

was lying on the ground.

Dr. Baden particularly disagreed with two of the medical examiner's conclusions from trial. First, he disagreed that the wound to Wilson's arm was a through and through wound from a single bullet, because there were two separate wounds that did not connect. Second, he disagreed with Dr. Segal's conclusion that there was no way to tell if the wounds to Wilson's arm were from a third bullet or a continuation from the two bullets that passed through Wilson's head. According to Dr. Baden, if the wounds in Wilson's arm were from a third bullet, they would "have to line up, one being the entrance, one being the exit, and there being a tract between the two[,]" which was not the case.

Dr. Baden concluded that Wilson was shot twice, and the wounds to her arm were continuation wounds from the two bullets that passed through her head. If she had been shot directly in the arm, the bullet would have gone all the way through. The two bullets found in her clothing were "spent" because they already had passed through the hard bones of her skull twice, which slowed them down "greatly" and prevented them from going through her arm.

Last, Dr. Baden opined that a hypothetical in which a person said he or she saw two people run up to the victims and shoot them in the head while they were standing, and then saw the victims drop to the ground, as Rand had

26

testified, would be "totally inconsistent with the way [Wilson] was shot and the way she was found."

Baker also presented expert testimony from Lucien C. Haag, who was qualified as an expert in ballistics, firearms identification, wound ballistics, and shooting incident reconstruction. Haag agreed with Jacobs's trial testimony that the three shell casings recovered at the scene were fired from the same weapon. He further opined that all three casings were fired from a semi-automatic pistol, which differed from Jacobs's testimony that he could not identify the type of firearm.

Haag explained that nine mm revolvers that fire Luger ammunition were "very rare." He stated he would "have a hard time finding one" because, unlike revolver cartridges, the Luger cartridges had no rim, which made them difficult to remove from a revolver. Additionally, in Haag's forty-seven years of experience, he was only aware of two instances in which shell casings were manually removed from a revolver at the scene of the crime. In both instances, it was done so that the shooter could reload the revolver, leading him to question Jacobs's testimony that it was a possibility in this case.

Haag also disagreed with Dr. Segal's trial testimony that the lack of "lands and grooves" on the two projectiles recovered from Wilson's clothing was due

27

to their degraded condition. He explained that it actually was due to shallow rifling, which is "a signature of very inexpensively made semi-automatic pistols." Haag testified that both bullets were fired from the same firearm, again contradicting Segal's testimony at trial that it could not be determined. Haag opined that the evidence did not support a conclusion that more than one gun was used in the shootings.

Haag examined the projectiles the day before his PCR testimony and discovered mineral grains as well as "abrasive damage . . . not from just hitting bone," which indicated that the bullets struck hard-packed soil. He also observed what he called the "bow effect," which occurs when a bullet ricochets off soil and the mineral grains "act just like a sand blasting" and leave "scoring" and "scratching" on the projectile. Crime scene photographs showed that the ground under Wilson's head was a "hard packed bare earth area" that was consistent with the mineral particles embedded in the tips of the bullets. Haag therefore concluded that the bullets struck the ground and ricocheted off at low velocity before they penetrated Wilson's arm. He opined that there was no way that could have occurred if Wilson was shot while she was standing upright and ruled that out as a possibility.

Haag's cross-examination in the PCR hearing did not occur until almost a

year later. He acknowledged that Turner died from a through-and-through bullet wound. Because the bullet that killed Turner was not recovered, and the murder weapon was never found, Haag could not rule out that a second firearm was involved, though he saw no evidence to support that notion.

On re-direct, Haag testified that he first described the bow-effect phenomenon in 1996, and that it started to be disseminated in the "firearms and tool marks community" in 2002. He agreed that the SEM/EDS[10] testing done by the State Police laboratory showed the presence of silica and several other minerals not associated with bone on the bullets. Haag also agreed that very few laboratories would have had a scanning electron microscope at the time of defendants' trial.

The parties stipulated in the PCR hearing to the admissibility of an expert report by Adele Boskey, Ph.D. She concluded that the high levels of silicon on the bullets could only have come from an exogenous source, most likely silicon dioxide in sand or dirt. In addition, Dr. Baden submitted a supplemental report that modified his initial conclusion that the bullets passed through Wilson's skull

---

[10]  As defined in defendants' brief, SEM/EDS refers to scanning electron microscopy with energy dispersive spectroscopy, which allows for an item to be examined at high magnification and analyzed to determine which chemical elements are present.

and then directly into her arm. Incorporating Haag's findings, Dr. Baden concluded that the bullets ricocheted off the ground before hitting Wilson's arm.

Stephen Deady, who worked in the ballistics unit for the State Police and the Ocean County Sheriff's Department, was qualified at the hearing as an expert in firearms identification and ballistics. He agreed with Haag that the two recovered bullets were most consistent with those used in the nine mm Luger caliber casings recovered at the scene, and likely were fired from an "inexpensive, cheaply made firearm," but he could not rule out other cartridges of the same caliber class because no firearm was recovered. He also agreed that the three shell casings were fired from the same firearm, but could not determine the type of firearm, though they were "consistent" with being discharged from a semi-automatic pistol, which was "the most common firearm from which they would be fired."

Deady posited, however, that the three shell casings would have a magazine mark, extractor mark, and ejector mark if they had been loaded into the magazine of a semiautomatic pistol and then extracted and ejected manually before being loaded in, and discharged from, a revolver. Thus, he could not determine what type of firearm discharged the shell casings. He agreed with Jacobs's trial testimony that more than one gun could have been involved in the

murders. All Deady could say conclusively was that the three shell casings were discharged from the same firearm, that the two bullets were fired from the same gun, and that he could not tell if the bullets and casings were fired from the same weapon.

Haag then testified in sur-rebuttal that the ejector marks on the shell casings were so deep that they could not have been made by manually ejecting the shells from a semiautomatic weapon. In addition, the combination and spatial orientation of the ejector mark, firing pin impression, and extractor mark, led him to conclude that the shell casings were discharged from a nine mm semi-automatic pistol. The relationship between the three marks was too consistent for them to have been manually ejected from a semiautomatic pistol and then fired from a revolver.

### 3. Washington's Filings and Motion Practice

Washington filed his own additional PCR petition and motion for a new trial in September 2014. Defendants filed a joint motion to consolidate their PCR petitions and later filed a motion for relief in the nature of summary judgment.

On June 16, 2016, the trial court entered an order and accompanying opinion denying those motions, but granting defendants an evidentiary hearing.

4. Fact Witnesses

    a. Washington's Testimony and Supporting Witnesses

Washington testified that he was having dinner and drinks with Beverly Branch in her apartment in Roosevelt Manor between 10:00 p.m. and 1:00 a.m. the night before the murders. He then went to another apartment, also in Roosevelt Manor, where a "bunch of males," including his nephew Wheeler and Raheem Miller, were drinking alcohol, smoking blunts, and listening to music. He asked Raheem to "roll [him] up a joint," but Raheem told him "you don't want none of this" because it was laced with PCP, which Washington previously had told them to stop smoking. Washington got mad and left around 4:30 a.m.[11]

According to Washington, he borrowed Wheeler's car and went back to Branch's apartment, but she could not get something to eat with him because her children were sleeping. He drove back towards the party and saw Moore, who flagged him down and asked if he wanted to buy some boneless chicken breasts. Washington paid him ten dollars for the chicken. Washington testified that this was not unusual because drug users were "always . . . running around selling things late at night."

---

[11] We use Raheem Miller's first name to avoid confusion because his mother Patricia Miller was a witness at the evidentiary hearing.

As recounted by Washington, he dropped the chicken off at his sister's apartment, drove to buy soft drinks, returned to his sister's apartment, and fried the chicken. He accidentally woke his nephew, Collins, and as they were talking and eating the chicken, Washington's pager went off. He admitted that he used the pager to deal drugs.

About twenty minutes later, Washington went to the pay phone near Eighth Street and Central Avenue to make the call, because the area code was not in Camden and his sister's phone was restricted to local calls. He brought fifty-five cents for the call, saying he knew the amount because he had placed the same call many times before, but the call did not go through, so he walked around looking to borrow money from someone. He explained that it was a "drug-infested area" and "people would be out all hours of the morning selling drugs, and people would be out there looking for drugs."

As Washington was walking, he noticed "a pile of something" on the ground, and as he approached and was about six to eight feet away, he realized it was two bodies in a pool of blood. He screamed "oh, my God, they dead, they dead" and people came to their windows to see what was happening. Washington thought one of the bodies was his nephew, Wheeler, because he saw an Army fatigue jacket similar to the jacket Wheeler was wearing earlier that

33

morning. As he ran back to the pay phone to call 9-1-1 he saw Moore, who "yelled [the victims'] names, and then . . . took off running."

Washington testified it was his voice in the audio recording of the 9-1-1 call reporting the deaths. After calling 9-1-1, he returned to the scene and remained there for three or four minutes until the police arrived, after which he went back to his sister's apartment and asked Collins about Wheeler. He called Wheeler from the phone in the apartment but could not reach him. Washington thought Wheeler was one of the victims even after Moore said it was "Rock" and "Murph," because he did not trust Moore and he was "traumatized" and upset.

Washington returned to the scene and encountered Patricia Miller on the way, and told her he had just found two dead bodies and thought one of them was his nephew. After staying at the scene for "a while," he went back to Branch's apartment and woke her up, crying, and told her what had happened.

After discovering that he was wanted for murder, Washington left Camden. He went to Newark, and then Trenton. While in Trenton, he learned that a man in Camden had been shot and killed and people thought Washington was the victim because they looked alike. He returned to Camden and was arrested on March 22, 1995.

Washington admitted selling drugs in the area of Roosevelt Manor, and occasionally hearing gunshots. He recognized that it was a dangerous area but said he did not fear for his safety. Washington admitted he was an "enforcer" in the drug trade, but denied ever owning a gun, although other friends and family members carried weapons. Washington claimed he had a fear of guns from the time he was young because his uncle died when a friend accidentally shot him.

Washington acknowledged he was charged with two additional homicides. In one case, a woman named Mary Trusty identified Washington and Wheeler as the individuals who murdered her cousin, but they were acquitted. Trusty was also the first person to identify Washington as a suspect in the murders of Turner and Wilson.

According to Washington, he told his trial counsel Kahn the first time they met that he made the 9-1-1 call, and Kahn said he would get the tape and have the voice analyzed. Washington also asserted he told all of his prior attorneys that he made the 9-1-1 call, but none of them obtained a copy of the recording, and he was not aware that a recording existed until Baker's current counsel obtained a copy in 2013. Washington explained that he had refused to sign an affidavit prepared for one of his PCR hearings because it incorrectly stated that

he had called 9-1-1 from his sister's apartment, instead of the pay phone. Washington testified that Collins incorrectly stated that Washington called 9-1-1 from the apartment.

Washington admitted he knew Baker, but stated he did not get along with him and they were not friends. Washington grew up in Roosevelt Manor, but Baker did not move to the neighborhood until he was eleven or twelve. They "didn't associate" because Baker "got into it one time with a gentleman from the neighborhood that [Washington] was cool with" and because Baker previously dated a girl that Washington later dated. Washington was aware that Baker sold drugs.

Washington also knew Turner, and although he "knew of" Wilson, he only knew her name and would not be able to recognize her. Around 2010 or 2011, Washington learned that Raheem Miller, who was by that point deceased, had told people that he shot Turner and Wilson.

Langston testified at Washington's hearing that two or three "close" gunshots woke her sometime in the morning of January 28, 1995, but she went back to sleep because "it was the norm." She was later awakened by a voice that sounded like Washington. Langston was unsure what time the shooting woke her or how long she fell back asleep before she heard Washington. She thought

that Washington was yelling for help and saying, "I'm bleeding," because he had been shot, but her boyfriend clarified that Washington said "they bleeding."

According to Langston, she went to her window and saw Washington walking towards the phone booth on the corner of 8th Street, and assumed he called the police. She remained at her window, and shortly afterwards she saw Washington return to the scene. Her boyfriend went outside and asked Washington what happened, to which Washington responded that there were two dead bodies in the courtyard.

Around that time Moore appeared at the scene, grabbed a stick that he used to lift the victims' hoods to reveal their faces, and said that the dead bodies were "Rock" and "Murph." "Murph" was Langston's cousin. Raheem Miller was her brother. Langston further testified that the voice on the 9-1-1 recording sounded like Washington.

Patricia Miller, Raheem's mother, testified that she heard gunshots that morning and ran to her children's rooms, but Raheem was not home. About fifteen minutes later she went outside, where she encountered Washington, who was "very emotional" and "had tears in his eyes." She asked him what was wrong, and he said that he thought his nephew Wheeler had been shot and was laying on the ground dead. She recognized the voice on the 9-1-1 call as

37

Washington's voice.

Branch, who was romantically involved with Washington at the time of the murders, testified that on the morning of the shootings Washington came to her house "very upset." He kept repeating, "They were dead." She also recognized Washington's voice from the 9-1-1 recording.

Lamont Powell testified that on the night before the murders he was at a party at his cousin's house in Roosevelt Manor "smoking weed and drinking" with Wheeler, Washington, who he called Stump, and Raheem, who he called Lump. Washington left in the early morning hours, and Raheem, who had smoked angel dust, decided that he was going to kill a witness in his brother's unrelated murder trial. Raheem, along with Wheeler, dressed in black and told Powell that they then went to a nearby house and kicked the door in, but the witness escaped. Wheeler left, and Raheem remained behind to wait for the witness to return, but was spotted by two people who said his name, so he shot them. Powell said that he did not "care for" Baker and was not friends with anyone at the apartment except Raheem.

Powell had a lengthy criminal history and had recently been sentenced to thirty-three months in prison for violating community supervision after serving a ten-year federal prison term. At the time of defendants' trial, he would not

have helped them unless Raheem gave him permission. Although he was friends with Raheem and said he "loved him," Powell also said that Raheem's death was "one of the best things that probably ever happened in this world" because he was "evil."

Henrietta Washington, Washington's mother, identified her son's voice as the caller in the 9-1-1 recording. Harriet Fleming, Washington's sister, also identified Washington as the caller. Likewise, Collins identified Washington as the caller in the 9-1-1 recording.

John Hamilton, an EMT, also testified at the hearing. Hamilton had been dispatched to the crime scene at 5:56 a.m. and arrived at 6:01 a.m. His report indicated that the two victims had been dead for approximately fifteen minutes. On cross-examination, he admitted that fifteen minutes was "a best guess." Robert Waszazak, who was also an EMT, testified that he might have moved Wilson's body to check her pulse and her pupil responsiveness, but was not sure.

Eric Winch, the director of I.T. projects at Seton Hall Law School, testified about an estimated timeline of events he created based on the 9-1-1 calls, police dispatch communications, and the distances between various locations. On cross-examination Winch acknowledged various assumptions and limitations that influenced his estimates.

Harry Reubel, an investigator in the Camden Region Office of the Public Defender, ("OPD") became involved with Washington's PCR petition in 2002. Reubel testified that the area where the shootings occurred was not visible from 10th Street and Van Hook Street, which was where Moore said he and Rand had been at the time of the incident.[12] He also testified that the only information provided to him by PCR counsel indicated that the shootings occurred at 5:57 a.m. He interviewed Collins, but could not locate Redden or Rand. He confirmed that Collins told him Washington called the ambulance and the police from a phone in the apartment.

Kahn, who represented Washington at trial, testified at the PCR hearing that he did not consider consulting a forensic pathologist, firearms examiner, or shooting incident reconstruction expert, and that an ordinary criminal defense lawyer in 1996 would not have done so either. From the first time Kahn met his client, Washington maintained that he was cooking chicken that morning and, when he went outside, he discovered the bodies and called 9-1-1.

Kahn admitted that he "did very little" to investigate Washington's claims, but he did send an investigator to interview Collins shortly before trial. Kahn

---

[12] Van Hook Street has been renamed Carl Miller Boulevard since the time of the murders.

said Washington provided him with the names of other people to corroborate his account, but he did not interview them. Kahn acknowledged he did not try to determine a timeline of events or the physical layout of the surrounding area.

Kahn was not aware that a recording of the 9-1-1 call existed. When it was played for him, he was "absolutely clear" that Washington was the voice on the recording and said that Washington sounded "distraught and upset." Kahn stated that if he had obtained the recording before trial, it "absolutely . . . would [have] changed everything" because he would have called Washington to the stand and "introduced that tape to corroborate his testimony."

Kahn admitted that he did not appropriately investigate the case before trial and "made an inappropriate and inaccurate decision . . . that this was best thought of as a one witness case." His inaction was based on the State's inability to locate Rand for a period of time prior to trial and his belief that Rand was a "very, very poor witness," who he characterized as "a prostitute, strung out on crack."[13]

### b. Baker's Testimony and Supporting Witnesses

Baker testified that he was with Redden at her mother's house in Roosevelt

---

[13] That court granted the State several continuances so that it could locate Rand. She eventually was located and held on a material witness warrant.

Manor cooking shrimp between midnight and 2:00 a.m. on January 28, 1995. Around 2:30 a.m., a friend, Teddy Hilton, gave them a ride to Redden's apartment in the Fairview section of Camden.[14] They went to sleep around 4:00 a.m., and remained inside the apartment for the rest of the day. He first learned about the murders when Redden's brother came by the apartment and told them what had happened. Baker did not recall watching any news programs about the murder with Redden. His PCR testimony was consistent with what he told the police after he was arrested.

At the time of the shootings, Baker knew who Washington was, but was not friends with him. The State offered Baker a plea deal of eight years in prison if he cooperated against Washington, but he could not give the police any information because he did not know anything about the shootings. Baker claimed that he had pled guilty to one of his prior felony convictions even though he was innocent in return for a favorable plea deal.

Sharay Redden, Michelle Redden's sister, testified that Michelle died of breast cancer in September 2013.[15] Michelle consistently repeated, over almost twenty years, that Baker was at her apartment in the Fairview section of Camden

---

[14] Hilton was deceased at the time of the instant PCR hearing.

[15] Her name is spelled both Sharay and Shray in the record.

at the time of the shootings and that he was not involved in the murders.

Another witness, Vinson Montgomery, was formerly the polygraph examiner for the OPD and was certified as an expert in the field of polygraphs. In 2008, he performed a polygraph examination of Baker in which Baker denied taking part in the killings of Turner and Wilson. He called Baker's polygraph results "amazing" and said he had a "high degree of confidence that Mr. Baker was telling the truth."

Gumminger, Baker's trial counsel, testified that Baker and Redden maintained that Baker was with Redden in her apartment at the time of the shooting. When he went over Glemser's report with Redden in November 1995, she identified several errors. In particular, Glemser wrote that Redden said her brother woke her and Baker "in the earlier hours of the morning" and informed them that "Murph" had been shot and killed. Redden clarified to Gumminger, however, that she told Glemser her brother woke her and Baker when it was "light out but approaching evening" and informed them that "Murph" and "Rock" had been killed.

More significantly, Glemser wrote that Redden told him that shortly after her brother woke them up, she and Baker watched a television show called "The Bulletin with Larry Kane" in which he discussed the murders. Glemser then

reached out to KYW News 3 in Philadelphia, which confirmed that Kane's show did not air the morning of the murders. Redden, however, told Gumminger that what she actually said to Glemser was that she was watching a show like "The Bulletin with Larry Kane," and it was about the general murder rate in Camden. She saw a news report about the murders later that evening. Those discussions between Gumminger and Redden were reflected in contemporaneous notes in his file, which he reviewed with counsel at the PCR hearing.

Defendants' counsel played for the court a recording from the 11:00 p.m. news, which started with a promotion for "The Bulletin with Larry Kane," included a report on the murders, and featured an interview with a prosecutor about the murder problem in Camden. Several Philadelphia television station reporters were present at the press conference about the murders. Gumminger testified that the recording "confirm[ed]" Redden's recollection and "undermine[d]" Glemser's report. He explained that although it did not prove Baker's whereabouts at the time of the murders, that fact was understandable because Baker and Redden were asleep at the time. He further explained that the video was of "extremely high value" because "it corroborate[d] the truthfulness of [Redden's] testimony and the veracity of it" and "show[ed] that she ha[d] a full, firm grasp on the sequence of events on that given day."

Gumminger admitted he had "adopted as fact" Glemser's report and "mistakenly took Glemser's version of events and misunderstood them to contradict what [Redden] was saying when, in fact, it was not contradicting what she was saying at all," but instead "misrepresenting" Redden's account. He testified that his misunderstanding was the main reason he did not call Redden as a witness at trial and that otherwise he would have called her to testify. Gumminger acknowledged he "could have discovered this information . . . and . . . undermined Glemser's report, or proceeded with the alibi," which would have been "much stronger." He also said that at Baker's first PCR hearing he was still under the mistaken impression that Glemser's report would undermine Redden's alibi statements. He added that he had never previously seen Glemser's letter to KYW News, or their response to him.

Gumminger did not have access to his case file when he testified as a witness for the State in Baker's first PCR hearing, and he repeated his trial errors because he still mistakenly believed that the State had undercut Redden's alibi testimony.

Gumminger confirmed that he received Moore's polygraph report in discovery. Moore denied murdering "Murph" and "Rock," being present when they were murdered, or knowing who committed the murders. He failed the

polygraph test, however, which indicated that he was lying. Rand was not given a polygraph examination, and Gumminger believed that was an intentional tactic by the State to intimidate Moore and undermine his testimony.

Gumminger explained he did not call Moore as a trial witness because he wanted to argue that Moore was the shooter and Rand was protecting him. He did not realize that the court would not permit him to argue Moore was the shooter during his summation without any corroborating evidence, and acknowledged that his "misapprehension of the law" prevented him from calling Moore as a witness. If he had a better understanding of the law, Gumminger said he would have called Moore as a witness to contradict Rand.

At the PCR hearing under review, Gumminger listened to an audio recording of Rand's police interview, and believed that when first asked to identify the shooters, she said the initials "J.D.," not "K.B.," as reflected in the transcript of the interview that was produced to defendants prior to trial. He explained that if he had the recording prior to trial he would have used it to support his argument that Rand did not know Baker "very well and her identification was shaky." Gumminger confirmed that at the time it was not typical for audio recordings to be turned over, only transcripts, and that he did not ask for the recording of Rand's police interview. He also confirmed that

there was no one with the initials "J.D." involved in the case, but said that he would have used this information to support an argument that Glemser "put the words K.B. in her mouth."

Gumminger also listened at the hearing to an audio recording of the police interview of Mary Trusty. In the recording, Trusty told police that Rand said she was present when the shootings occurred, but Rand did not tell Trusty whether she witnessed the shooting. Trusty explained that Rand "might as well say it" and that Rand "didn't say who did the shootings, because [Trusty] already had knew." Trusty added that she "knew" because she heard "talk" that Washington was the shooter. Gumminger said that Trusty's failure to name Baker, and her statement that her knowledge about who shot Wilson and Turner was based on second-hand "talk," would have been useful at trial.

Crisonino, Baker's first PCR counsel, said he had pursued a theory that Washington was the lone gunman. Baker initially advanced that theory in the current PCR proceedings, but abandoned it once the State produced the 9-1-1 recording and his counsel established that Washington was the caller.

Michael Klein, a former manager in the Public Defender's Office, testified that Baker's second PCR counsel never submitted a request for an expert and did not do much work on the case.

47

### 5. Other Evidence

On the second-to-last day of the PCR hearing, defendants' counsel indicated to the court that although they served subpoenas on Rand and Moore, the two did not appear at the hearing. Nonetheless, counsel declined to request a bench warrant. Instead, they submitted a certification dated September 19, 2012, from Carla Johnson, who was deceased at the time of the hearing, claiming that Rand said she did not witness the murders. They submitted another certification dated March 14, 2003, from Anna Griffin, who was also deceased at the time of the hearing, stating that she had overheard Rand recant her trial testimony.

### I. The PCR Court's Decision

On August 31, 2017, the court entered an order denying defendants' PCR petitions and motions for a new trial. The court explained its reasoning in a 112-page decision that predominantly recounted the testimony set forth above. The court found that Baker, Washington, Kahn, Gumminger, Collins, Langston, Powell, and Winch all were not credible witnesses. It assumed, without deciding, that a freestanding actual innocence claim was cognizable in New Jersey, but held that defendants did not meet their burden to show that they were innocent.

Among other things, the court determined that defendants' ineffective assistance of counsel claims were time-barred. Proceeding nonetheless to the merits of those claims, the court concluded defendants' trial attorneys were not deficient and defendants did not suffer prejudice from their attorneys' failure to call potential witnesses at trial. The court also found the prosecution did not suppress material evidence.

The court further ruled that defendants did not establish that newly discovered evidence entitled them to a new trial, either because the evidence could have been discovered prior to trial through the exercise of reasonable diligence, or because it would not undermine the jury's verdict.

J. Defendants' Appeals

Defendants both appealed, and we listed their appeals back-to-back. We entered an order granting a motion of Askia Jabar Nash, Rodney Roberts, David Shephard, and Anthony Ways to participate as amici curiae (the "exoneree amici") in support of defendants. We also entered orders granting amici status to the Innocence Project, the Exoneration Initiative, and the Innocence Network (innocence organization amici) in support of defendants.

We further granted the Attorney General's motion to file an amicus brief on a self-selected limited basis to address solely the question of whether an

49

"actual innocence" standard should or needs to be adopted under New Jersey law. We permitted all amici parties to participate in oral argument. We have consolidated defendants' appeals, which were calendared together, for purposes of this single opinion.[16]

## II.

### (Overall Legal Standards)

Defendants contend the PCR court erred by declining to set aside their convictions based on newly discovered evidence and the alleged ineffectiveness of their previous counsel. As part of their arguments, defendants and the amici aligned with them advocate that New Jersey courts adopt more receptive standards for entertaining such claims. They argue wrongfully convicted persons in our state should be permitted to gain relief if they show they are "actually innocent" of the crimes for which they had been found guilty, regardless of customary procedural bars that may disallow such claims.

We need not address these contentions for a change in New Jersey law because, as our analysis will show, defendants are entitled to a new trial under our existing analytical framework governing PCR and claims of newly

---

[16] We are most grateful for the helpful written and oral advocacy of the amici.

discovered evidence.  Moreover, any ultimate change in the legal framework is more appropriately for the Supreme Court, and not this intermediate appellate court, to consider.

Defendants' claims implicate well-established legal standards for claims of newly discovered evidence and PCR petitions.  The standards are somewhat related and overlapping.  They consist of the following.

A. PCR

"Post-conviction relief is New Jersey's analogue to the federal writ of habeas corpus."  State v. Pierre, 223 N.J. 560, 576 (2015) (quoting State v. Preciose, 129 N.J. 451, 459 (1992)).  It serves as a safeguard to ensure that a criminal defendant was not unfairly convicted and is the "last line of defense against a miscarriage of justice."  State v. Nash, 212 N.J. 518, 526 (2013).

The grounds for post-conviction relief include, in relevant part:

> (a) Substantial denial in the conviction proceedings of defendant's rights under the Constitution of the United States or the Constitution or laws of the State of New Jersey; [or]
>
> . . . .
>
> (d) Any ground heretofore available as a basis for collateral attack upon a conviction by habeas corpus or any other common-law or statutory remedy.
>
> [R. 3:22-2.]

The burden is on the defendant to establish his or her right to post-conviction relief "by a preponderance of the credible evidence." Nash, 212 N.J. at 541 (quoting Preciose, 129 N.J. at 459).

If a trial court holds an evidentiary hearing on a motion for a new trial or a PCR petition, an appellate court generally "applies a deferential standard; it 'will uphold the PCR court's findings that are supported by sufficient credible evidence in the record.'" Pierre, 223 N.J. at 576 (quoting Nash, 212 N.J. at 540). Appellate courts do not defer to a trial court's interpretation of the law, which is reviewed de novo. Ibid. When considering mixed questions of law and fact, we will defer to the PCR court's factual findings that are supported by the record, but exercise plenary review over "the lower court's application of any legal rule to such factual findings." Id. at 577. Subject to certain exceptions we will apply, infra, we ordinarily defer to a trial court's credibility determinations because it has the ability to observe the testimony firsthand. Pierre, 223 N.J. at 576.

B. New Trial Motions

Rule 3:20-1 governs motions for a new trial, which in the post-conviction context often are brought in conjunction with a PCR petition. A new trial motion "based on the ground of newly-discovered evidence may be made at any time . . . ." R. 3:20-2. A court must examine newly discovered evidence "with a certain

degree of circumspection to ensure that it is not the product of fabrication[.]" State v. Ways, 180 N.J. 171, 188 (2004). Nonetheless, "[h]owever difficult the process of review, the passage of time must not be a bar to assessing the validity of a verdict that is cast in doubt by evidence suggesting that a defendant may be innocent." Ibid.

Newly discovered evidence is sufficient to warrant a new trial only if it is: "(1) material to the issue and not merely cumulative or impeaching or contradictory; (2) discovered since the trial and not discoverable by reasonable diligence beforehand; and (3) of the sort that would probably change the jury's verdict if a new trial were granted." State v. Carter, 85 N.J. 300, 314 (1981). All three prongs of the Carter test must be satisfied to grant a new trial. Ibid.

Under the first prong of the Carter test, evidence is material if it "would 'have some bearing on the claims being advanced.'" Ways, 180 N.J. at 188 (quoting State v. Henries, 306 N.J. Super. 512, 531 (App. Div. 1997)). To that end, "[c]learly, evidence that supports a defense, such as alibi, third-party guilt, or a general denial of guilt would be material." Ibid.

In order to determine "whether evidence is 'merely cumulative, or impeaching, or contradictory,' and, therefore, insufficient to justify the grant of a new trial requires an evaluation of the probable impact such evidence would

have on a jury verdict." Id. at 188-89. "Therefore, the focus properly turns to prong three of the Carter test, whether the evidence is 'of the sort that would probably change the jury's verdict if a new trial were granted.'" Id. at 189 (quoting Carter, 85 N.J. at 314).

Thus, it is clear that the first and third prongs of the Carter test are "inextricably intertwined." Nash, 212 N.J. at 549. Indeed, the "analysis of newly discovered evidence essentially merges the first and third prongs of the Carter test." State v. Behn, 375 N.J. Super. 409, 432 (App. Div. 2005). Under that rubric, "[t]he characterization of evidence as 'merely cumulative, or impeaching, or contradictory' is a judgment that such evidence is not of great significance and would probably not alter the outcome of a verdict." Ways, 180 N.J. at 189. By contrast, evidence "that would have the probable effect of raising a reasonable doubt as to the defendant's guilt would not be considered merely cumulative, impeaching, or contradictory." Ibid. (emphasis added).

In short, the "power of the newly discovered evidence to alter the verdict is the central issue, not the label to be placed on that evidence." Id. at 191-92. Appellate courts "must engage in a thorough, fact-sensitive analysis to determine whether the newly discovered evidence would probably make a difference to the jury." Id. at 191.

The second prong of the Carter test "recognizes that judgments must be accorded a degree of finality . . . ." Id. at 192. That prong therefore requires that the "defense . . . 'act with reasonable dispatch in searching for evidence before the start of the trial.'" Nash, 212 N.J. at 550 (quoting Ways, 180 N.J. at 192). Under that prong, the evidence must not have been discoverable prior to trial through the exercise of "reasonable diligence" in the context of the specific circumstances of each case. Reasonable diligence does not require "totally exhaustive or superhuman effort." Behn, 375 N.J. Super. at 428.

That said, a defendant "is not entitled to benefit from a strategic decision to withhold evidence." Ways, 180 N.J. at 192. A defendant gains no strategic advantage, however, if her or his attorney "fails to discover or overlooks exculpatory evidence." Ibid. For that reason, the New Jersey Supreme Court has recognized the "important caveat" that evidence "'clearly capable of altering the outcome of a verdict that could have been discovered by reasonable diligence at the time of trial would almost certainly point to ineffective assistance of counsel.'" Nash, 212 N.J. at 550 (quoting Ways, 180 N.J. at 192).

With respect to newly discovered scientific evidence, Rule 3:20-2 "presents a viable means by which a defendant can seek a new trial if he can now show that recently improved scientific methodology, not available at the

time of trial, would probably have changed the result." State v. Halsey, 329 N.J. Super. 553, 559 (App. Div. 2000). Courts recognize that "[s]cience moves inexorably forward and hypotheses or methodologies once considered sacrosanct are modified or discarded." Behn, 375 N.J. Super. at 429. Thus, the "judicial system, with its search for the closest approximation to the 'truth,' must accommodate this ever-changing scientific landscape." Ibid.

When, as here, a defendant presents scientific evidence in support of a motion for a new trial, the court must decide whether, at the time of trial, the science supporting the defense argument was established. For instance, in State v. Peterson, 364 N.J. Super. 387, 398 (App. Div. 2003), the court held that DNA testing qualified as newly discovered evidence even though "early forms of DNA testing were in use at the time of defendant's trial" because it had "become more common and more reliable in the intervening fourteen years." Of course, there can be "no doubt" that scientific evidence "not developed until after defendant's trial" constitutes newly discovered evidence because "no amount of reasonable diligence could have uncovered" evidence that "did not exist previously." Behn, 375 N.J. Super. at 429.

III.

(The Newly Discovered Evidence)

Defendants argue that the newly discovered forensic evidence, as presented by Dr. Baden, Haag, and in Boskey's report contradicts and severely undermines Rand's account of the shootings. They further contend Rand recanted her trial testimony, as reflected in two certifications from deceased witnesses. They also point to several other non-forensic proofs, including the seven identifications of Washington's voice on the 9-1-1 recording, which they contend are strongly exonerative.

A. Forensic Evidence

Defendants argue the forensic testimony was not discoverable with reasonable diligence prior to trial and is material because it probably would change the jury's verdict. The PCR court agreed with defendants that Haag's report and testimony—which showed that the bullets that killed Wilson ricocheted off the ground and therefore that she was lying down when she was shot—could not have been discovered prior to trial through reasonable diligence. We concur.

Defendants' trial was in 1996, the same year Haag first identified the bow-effect phenomenon, which was not widely disseminated throughout the

scientific community until 2002. Very few laboratories were equipped with a scanning electron microscope at the time of trial.

We disagree, however, with the trial court's separate conclusion that Haag's findings were not material and probably would not change the jury's verdict if a new trial were granted. The court believed Haag's new evidence would not contradict Rand's account because she never literally testified that Wilson was standing when she was shot. Therefore the court did not deem the scientific proof material under Carter. The court's decision on this aspect of the Carter test is reviewed de novo because it requires an application of the law to the facts of the case. Behn, 375 N.J. Super. at 433.

The evidence presented by Haag was "clearly not cumulative since no comparable evidence was offered at trial." Behn, 375 N.J. Super. at 431. The evidence would impeach Rand's testimony, so the question becomes whether it would probably change the jury's verdict if the court granted a new trial. Nash, 212 N.J. at 549; Ways, 180 N.J. at 188-89. We believe it would.

Although Rand never explicitly testified that Wilson was standing when she was shot, the gist of her testimony was that both victims were standing, as confirmed by the entirety of the record.

Specifically, the prosecutor asked Rand to describe what she witnessed,

and she answered that she saw Turner and Wilson "when they dropped." When asked who was shot first, the transcript indicates that Rand said she saw "them drop first," but the court immediately clarified that Rand said she saw "him" drop first, referring to Turner. Thus, Rand's trial testimony plainly reflects her contention that both victims were standing when they were shot and then dropped to the ground.[17]

Rand also testified that "the whole shooting" lasted a couple of seconds, which was consistent with her police interview, during which she told Glemser that defendants shot the victims "a couple seconds" after they ran up to them and the "whole thing" lasted only a "couple of seconds." She explained to Glemser that defendants "came from around the corner, like out of nowhere[,]" ran up to Wilson and Turner, shot them in the head, and then kept on running. Rand stated she was certain that defendants were running the whole time, and that it was not "an on-going thing." She agreed that defendants "ran up on 'em, shot 'em, and then kept on runnin." Indeed, Rand said that she would not have witnessed the

---

[17] The only portion of Rand's testimony that arguably could be read to suggest that Turner and Wilson were on the ground when they were shot was when she said that "[t]hey lay right next to each other[.]" We interpret that remark to mean that the victims' bodies ended up on the ground next to each other, as shown in the crime scene photographs, not that they were lying down before they were shot.

shootings if the incident lasted any longer because she would have fled the scene.

Notably, Glemser understood Rand's account to be that the victims were shot while they were standing. He wrote in his supplemental report that "Rand state[d] that this entire situation only took a couple of seconds and immediately after both victims were shot in the head, they fell to the ground as both suspects identified as Kevin Baker and Sean Washington continue[d] running away from the victims." (Emphasis added).

At trial, the trial judge seemingly understood Rand's testimony to be that defendants shot the victims while they were standing. That is reflected in his reason for not instructing the jury on the lesser-included offenses of aggravated manslaughter and manslaughter. He stated, "[T]he only evidence as to what allegedly occurred is the testimony of [Rand] who indicated she saw the defendants basically walk up behind the victims, point a gun and shoot the two victims in the head and flee."

Rand's account of the killings was, in essence, a "run-by shooting." By contrast, the new forensic evidence shows it likely was an execution-style killing, in which at least one victim was forced to lie on the ground before being shot. Rand's account realistically would not allow time for defendants to

approach Turner and Wilson, order them to lay on the ground, and then shoot them.

When examining the impact of newly discovered evidence, it must be "placed in context with the trial evidence . . . ." Ways, 180 N.J. at 195. An appellate court therefore must consider the State's proofs at trial. See ibid. (characterizing State's proofs as "far from overwhelming"). Here, there is a patent weakness in the State's case against defendants, which another panel of our court previously characterized as "not overwhelming."

Rand's trial testimony was the only eyewitness evidence linking defendants to the murders. At best her account was inconsistent and at times incoherent.

For instance, Rand stated at the time of the murders "it was dark, but it was light." She first testified that she saw one defendant carrying a gun, but could not recall which one. She later testified that she only saw Baker with a gun, not Washington. She then testified that she only saw Washington with a gun, not Baker. In her police interview, however, when asked if she saw anyone holding a gun, Rand said she paid no attention. After being directed to read that portion of her statement while she was on the stand, she testified that she "just had to be paying attention[,]" before admitting that she "wasn't paying no

attention." She later said that was "the answer at the time[,]" as if the facts of what she witnessed could change. Rand was also untruthful about her willingness to testify.

At trial, Rand could not remember who was shot first or which defendant shot each victim until she read those critical facts from portions of her police interview.[18] Even after reading her statement, she initially could not recall if she saw Baker shoot Turner.

As we previously noted, Rand's answers about how long she knew Baker varied from not being able to recall because she "kept forgetting" to "not that long" to "some years," to "several years" to "two years" to "five or six" years.

Rand initially testified that Moore was behind her at the time of the shootings, but in her police interview she said he was in front of her, and after being alerted to the discrepancy, said that he was in "[f]ront of me, behind me[,]" before changing her testimony to reflect that Moore was in front of her, and then changing it again to say that she did not remember.

It must be underscored that Rand was a known drug addict who smoked crack cocaine every two to three hours, which she characterized as "not that

---

[18] Rand was even uncertain about whether the transcript she read was of her police interview.

A-0716-17T3

often[.]" She was admittedly high at the time of the murders. She was approximately ninety feet away when the shooting occurred and it was dark outside. The entire incident took only a "couple of seconds." She also saw a gun, or multiple guns, depending on whether one credits her police interview or trial testimony.

These perception factors all can influence an eyewitness identification. In State v. Henderson, 208 N.J. 208, 261-66 (2011), the Court recognized each of them – intoxication, distance, lighting, duration, and the distraction of a visible weapon – as "estimator variables" that can impede the accuracy and reliability of eyewitness identifications.

Dr. Baden's testimony further supported Haag's conclusion that Wilson was laying on the ground when she was shot. He consistently testified that, based on the trajectory of the two bullets, Wilson was shot twice while lying on the ground with her arm next to her head. After receiving Haag's report, Dr. Baden filed a supplemental report, opining that the bullets ricocheted off the ground before entering Wilson's arm. He asserted that Rand's testimony was "totally inconsistent with the way [Wilson] was shot and the way she was found."

The court found that Dr. Baden essentially was offering a new opinion

based on old evidence. The court, however, did not distinguish adequately between the various aspects of Dr. Baden's testimony.

For instance, it is not clear that Dr. Baden's conclusion that Wilson was shot twice and that the bullets entered her arm after passing through her skull—which is the portion of his testimony relevant here—was discoverable prior to trial with reasonable diligence. At trial, the medical examiner testified that "[t]here is no way to tell whether this bullet passing through the arm was related to either of these two [head] wounds or was a third wound." If Dr. Baden's conclusion was discoverable with reasonable diligence prior to trial, then the medical examiner also should have discovered it. See Behn, 375 N.J. Super. at 433 ("Having offered these proofs and argued their significance, the State should not be permitted to now 'walk away' from its evidence and demean its importance.").

Moreover, the pertinent question is not whether the evidence was theoretically discoverable at the time of trial, but whether a reasonably diligent attorney would have discovered it prior to trial. Peterson, 364 N.J. Super. at 398. Kahn and Gumminger were experienced criminal defense attorneys. Notably, Kahn in particular testified that he had not used forensic experts at the time of defendants' trial, that he did not consider retaining a forensic expert, and

that a reasonably diligent attorney would not have done so at that time, all of which suggest that a reasonably diligent attorney would not have retained a forensic expert at that time.

The trial court found that Gumminger and Kahn generally were not credible, but made no specific findings with respect to their testimony about retaining a forensic expert.[19] If that testimony was credible, then a reasonably diligent attorney would not have discovered the forensic evidence prior to trial.

If, on the other hand, the attorneys' testimony was not credible, it still must be remembered that evidence "'clearly capable of altering the outcome of a verdict that could have been discovered by reasonable diligence at the time of trial would almost certainly point to ineffective assistance of counsel.'" Nash, 212 N.J. at 550 (quoting Ways, 180 N.J. at 192). "It hardly bears mentioning that '[w]e would not require a person who is probably innocent to languish in prison because the exculpatory evidence was discoverable and overlooked by a

_____

[19] The court found that Kahn was not credible because he was "trying to help a former client" and the new attorneys "convinced" him that he should have done more at trial. We note, however, that it was apparent at trial and sentencing that Kahn believed that Baker's conviction was unjust. The court gave no reasons for its finding that Gumminger was not credible, and specifically found that he was credible about one thing, that he and Baker discussed the problems with calling Redden as a witness given her lack of credibility. See Ways, 180 N.J. at 196 ("We find it somewhat curious that the PCR court found [the witness] incredible in all respects but this one.").

less than reasonably diligent attorney.'" Ibid. (alteration in original) (quoting Ways, 180 N.J. at 192).

Haag also testified that only one gun likely was used in the murders. The trial court, however, found that defendants "have not proved a second weapon was not involved" to a degree of "practical certainty" and it therefore could not "exclude the existence of two weapons being used, by two shooter[s]." The court was correct that Haag's testimony did not "prove" only one gun was used. But that is not the proper test to apply to newly discovered evidence. The proper test is whether the new evidence "probably" would have changed the outcome of the trial. Behn, 375 N.J. at 432.

Here, the testimony that only one gun was used would have sharply contradicted Rand's account of events. Although Haag could not completely rule out the possibility that a second gun was used, it was very unlikely.[20] Even Deady agreed that Haag's testimony was the most likely explanation, although he recognized that it was not certain or provable because the bullet that killed Turner and the gun were never recovered. The forensic likelihood that only one

---

[20] Rand's testimony that the shootings lasted a couple of seconds also undercuts the State's theory that one of the defendants may have fired a revolver, because it left no time for the shooter to manually remove the three spent rimless casings from the revolver.

gun was used in the murders, in combination with the evidence showing that Wilson was laying on the ground when she was murdered, is yet another point that would undercut Rand's shaky testimony.

The forensic evidence contradicting Rand's description of the manner of shooting would materially strengthen a defense argument that her testimony should be disbelieved in its entirety. See State v. Young, 448 N.J. Super. 206, 228 (App. Div. 2017) (finding a "false in one, false in all" inference was justified, in light of "conflicting evidence" about the defendant-witness's statements, and indicia they were not "'[i]nadvertent misstatements or immaterial falsehoods'" (quoting State v. D'Ippolito, 22 N.J. 318, 324 (1956)).

Lastly, in considering the significance of this new and essentially unrefuted forensic evidence, we also bear in mind that the jury acquitted both defendants of the unlawful possession of a weapon charges. Although inconsistent verdicts are generally tolerable, the jury's not-guilty findings on those particular weapons counts provide yet another reason to believe the newly developed scientific proof could have tipped the balance in favor of the defense on the murder counts.

B. Proof of Washington's Identity As the 9-1-1 Caller

We find it appropriate to consider the 9-1-1 audio evidence, which only emerged before the trial court's most recent evidentiary proceedings. The recording had not been considered on direct appeal or in any of defendants' previous collateral proceedings.

The audio evidence was not discovered by trial counsel. Washington consistently maintained that he discovered the bodies and called 9-1-1, which he told his attorney Kahn prior to trial. Kahn, however, did not request a copy of the 9-1-1 tape and contends he was unaware of its existence.

The trial court rejected Washington's claim for relief because it believed that the decision not to play the tape for the jury was "likely . . . part of a strategic trial decision." Strategic decisions made after less than complete investigations, however, are not entitled to deference. State v. Savage, 120 N.J. 594, 617-18 (1990). Without knowing about and obtaining the tape to ascertain if Washington made the 9-1-1 call, Kahn was in no position to make a strategic decision whether to present the tape to the jury as part of an alibi defense on Washington's behalf.

We are persuaded that the 9-1-1 audio proof provides support for relief under Rule 3:20. The evidence clearly satisfies the first and third prongs of

Carter. Carter, 85 N.J. at 314. Moreover, we do not construe the Supreme Court's application of the second prong of the Carter test for newly discovered evidence to be so rigid so as to preclude relief under Rule 3:20 under the circumstances presented here. As the Court noted in Nash, "'[w]e would not require a person who is probably innocent to languish in prison because the exculpatory evidence was discoverable and overlooked by a less than reasonably diligent attorney.'" Nash, 212 N.J. at 550 (alteration in original) (quoting Ways, 180 N.J. at 192). Hence, whether or not trial counsel were ineffective by not obtaining and presenting the 9-1-1 audio, that evidence, along with the forensic proofs, must be fairly considered in determining whether a new trial is warranted.[21]

It is clear from the audio recording that the 9-1-1 caller was distraught. That lends support to the notion that the caller was not the person who just shot Turner and Wilson. Despite seven witnesses who testified at the PCR hearing that the voice on the 9-1-1 tape was Washington's, the court found that "there was no credible evidence . . . Washington made the [9-1-1] call from

_____

[21] We further note that a motion for a new trial under Rule 3:20 is not governed by the procedural limitations expressed in Rule 3:22. Rule 3:20-1 provides an independent avenue for relief where "it clearly and convincingly appears that there was a manifest denial of justice under the law."

a payphone." Although the court found a few of the witnesses who identified Washington's voice were credible, including Washington's mother and sister, it rejected their identifications because those persons were biased and "motivated to assist" him.

The Supreme Court has cautioned about negative credibility findings that are based "solely on account of [a] familial relationship . . . ." Ways, 180 N.J. at 196. It is not at all apparent that anyone except Washington's friends and family could reliably identify his voice. Whether Washington actually is the person who called 9-1-1 is a question for a new jury to make after it "determine[s] each witness's knowledge, bias, consistency, and overall credibility." Nash, 212 N.J. at 553.

The trial court also found that if "Washington placed the call from the payphone, it would have put [him] at the scene of the crime." That is true, but it deserves less weight than the court placed on it. Washington has always asserted that he discovered the bodies and therefore admits he was at the scene, but just not at the time of the murders. He never tried to place himself away from the crime scene. If, in fact, Washington made the initial 9-1-1 call, that evidence had the potential to sway the jury's verdict, particularly after taking into account the weakness of the State's case.

70

We recognize that even if the jury believed Washington called 9-1-1, the jury could still determine that he shot Turner and Wilson. But "an 'outcome determinative standard' impose[s] too heavy a burden" on a defendant. State v. L.A., 433 N.J. Super. 1, 14 (App. Div. 2013) (quoting Strickland, 466 U.S. 668, 694 (1984)). A defendant need not show that it is "more likely than not" that she or he is innocent. Instead, a defendant must show a reasonable probability that is sufficient to undermine confidence in the outcome of the trial. Ibid. Considering the 9-1-1 evidence in conjunction with the forensic proof that undercuts the account of the sole alleged eyewitness, defendants have established such a reasonable probability here.

C. The Other Non-Forensic Proofs

Aside from this heavily corroborated evidence identifying Washington as the 9-1-1 caller, we rely on none of the other non-forensic proofs defendants have presented. As to those particular proofs, we generally defer to the trial court's assessment that they either lack sufficient probative value to warrant a new trial, or could reasonably have been developed and presented to the court sooner, or both.

71

IV.

(Impact of the Additional Proofs)

Viewing the totality of the evidence, the "new" evidence – particularly the forensic evidence, in context with the State's weak trial proofs that hinged so vitally upon Rand's account – was material and probably would have changed the jury's verdict.

Rand's identification of defendants as the shooters was the singular "focal issue of the trial and must be considered material." Behn, 375 N.J. Super. at 431 (quoting Henries, 306 N.J. Super. at 531). As we have elaborated, the forensic evidence that Wilson was lying on the ground when she was shot, if it had been available at the time of defendants' trial, would likely have been admissible and would have undercut Rand's account of events. The same is true for Haag's and Dr. Baden's testimony that only one gun was used in the murders. Because Rand was the only witness linking the defendants to the murders, and given the extensive weakness of her testimony, the new evidence would probably have changed the outcome of the trial.

The trial court relied analytically on the fact that the "jury found [Rand's] testimony to be credible." Case law, however, has disapproved of such undue reliance. See L.A., 433 N.J. Super. at 18 ("The court erred by relying on the

jury's apparent finding that [the witness] was credible, because it voted to convict."). Applying the proper legal test, we are persuaded that a new trial is warranted.

At such a trial the strong forensic proofs, and the 9-1-1 call evidence, will be presumptively admissible, subject to the State's right of timely objection.[22]

To be sure, courts that set aside verdicts "do not decide where the truth ultimately lies, because that function falls within the exclusive purview of the jury after reviewing all the evidence." Ways, 180 N.J. at 197. In this case, that will be the newly discovered forensic evidence and the proofs concerning Washington's voice on the 9-1-1 recording. A jury is the proper entity to "determine each witness's knowledge, bias, consistency, and overall credibility," and render a verdict. Nash, 212 N.J. at 553. Given the time that has passed since the trial, there will be "difficulties" associated with a retrial at this late date, "[b]ut the passage of time is an insufficient reason not to correct an injustice." Ways, 180 N.J. at 197. Because there is "a probability—not a

---

[22] Hence, we do not reach the more expansive question of whether inadmissible evidence could justify granting defendants a new trial. For example, we do not rely in our decision upon the arguably inadmissible social science experiment performed by the defense, which tested what a group of non-jurors thought about what initials for a shooter were uttered by Rand on the audio of her police interview.

certainty—that a new jury would find [defendants] not guilty," they are entitled to a new trial.  Ibid.

Based on the newly discovered evidence, we therefore reverse the trial court's denial of defendants' motions for a new trial, and remand to enable the State, if it so chooses, to retry the case.

V.

(Ineffective Counsel Claims)

As a separate theory for relief, defendants argue that the court erred by holding that their ineffective assistance of counsel claims were time-barred.  We briefly discuss this procedural issue for sake of completeness.

The trial court found defendants' ineffective assistance of counsel claims "ha[d] been raised before in each of [their] prior [PCR] petitions,"  It then determined that their claims were time-barred under Rule 3:22-12(a)(2).

As relevant here, under Rule 3:22-4(b), a second or subsequent PCR petition "shall be dismissed" unless:

> (1) it is timely under Rule 3:22-12(a)(2); and
>
> (2) it alleges on its face . . .
>
>  . . . .
>
> (B) that the factual predicate for the relief sought could

not have been discovered earlier through the exercise of reasonable diligence, and the facts underlying the ground for relief, if proven and viewed in light of the evidence as a whole, would raise a reasonable probability that the relief sought would be granted . . . .

[R. 3:22-4(b).]

Rule 3:22-12(a)(2), in pertinent part, provides that notwithstanding any other provision of the Rule, no second or subsequent PCR petition shall be filed more than one year after the latest of:

(B) the date on which the factual predicate for the relief sought was discovered, if that factual predicate could not have been discovered earlier through the exercise of reasonable diligence . . . .

It further provides that "[t]hese time limitations shall not be relaxed, except as provided herein." R. 3:22-12(b).

Defendants argue their ineffective assistance of counsel allegations were timely because they filed their PCR petitions within one year of discovering the factual predicates for their claims. The exoneree amici similarly argue that Rule 3:22-12(a)(2) allows a defendant to bring an ineffective assistance of counsel claim within a year of the discovery of the factual predicate of his or her claim no matter how many years have passed since the defendant's trial. They further argue the "reasonable diligence" requirement of Rule 3:22-12(a)(2) must be viewed from the perspective of the defendant, not his or her counsel.

Baker identifies the following factual predicates that he "discovered" in the year before he filed his PCR petition: (1) a video recording of KYW-3 Philadelphia news coverage from the night of the murders; (2) a certification from Gumminger stating that he did not review his file prior to testifying in Baker's 1999 PCR proceeding; (3) Miron's file from when he was Baker's PCR counsel; and (4) Haag's and Dr. Baden's forensic reports.

It is not clear what the connection is, if any, between Baker's receipt of Miron's file and his ineffectiveness claim. The information that Baker gleaned from Miron's file that served as a factual predicate to his PCR petition is unstated. Even if the evidence in Miron's file showed Baker's trial counsel was ineffective, then it necessarily also showed that the same evidence could have been discovered earlier than 2012 through the exercise of reasonable diligence.

All of these identified factual predicates were discoverable by Baker earlier through the exercise of reasonable diligence. Baker knew, or should have known, that Gumminger did not review his file and testified solely based on his memory in 1999 because Gumminger admitted it during the evidentiary hearing. The television programs Redden claimed she was watching on the day of the murders had been in dispute since before defendants' trial, so they were aware that the television programming was a key issue. Indeed, in Baker's prior PCR

petition he argued that his trial counsel was ineffective for failing to call Redden as an alibi witness and have her testify about watching news coverage of the murders, but the court rejected that argument. We do not disturb that finding.

Washington, meanwhile, argues that his petition was timely because he filed it within one year of the State producing discovery to Baker, including the audio recordings of the 9-1-1 call he allegedly made. The State counters that the 9-1-1 evidence could have been discovered earlier through the exercise of reasonable diligence. R. 3:22-12(a)(2)(B). The State's position comports with our ruling in State v. Jackson, 454 N.J. Super. 284, 292-94 (App. Div. 2018).

Both defendants argue that the failure to relax the time bar of Rule 3:22-12(a)(2) to permit PCR relief in the exceptional context of this case would result in a "fundamental injustice." In Jackson, 454 N.J. Super. at 292-94, this court held that after the PCR rule amendments in 2009 and 2010 the fundamental injustice exception did not apply to second or subsequent PCR petitions and that the time limits in Rule 3:22-12(a)(2) could not be relaxed.

We need not address here whether, as defendants and their amici advocate, the law of our State should enable our courts, in limited and compelling circumstances, to disregard the time bar as a matter of fundamental fairness or jurisprudential policy, or whether the PCR rules should be prospectively

amended in some fashion. We leave such an assessment to the Supreme Court.

Instead, we assume for sake of discussion the time bar under Rule 3:22-12(a)(2) pertains and therefore do not address the substantive issues of ineffectiveness concerning the 9-1-1 audio evidence. In any event, the denial of defendants' PCR ineffectiveness claims under Rule 3:22 does not preclude relief to them under the separate pathway of Rule 3:20 for newly discovered evidence, including the forensic proof and the 9-1-1 identification evidence. See R. 3:20-2 ("A motion for a new trial based on the ground of newly-discovered evidence may be made at any time, but if an appeal is pending the court may grant the motion only on remand of the case."). We therefore rest our analysis and the grant of a new trial upon Rule 3:20, not Rule 3:22.

VI.

(Brady v. Maryland Issues)

Briefly, we reject defendants' claim the State suppressed material evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963). We adopt the trial court's conclusion that no Brady violations occurred. The court found no evidence that Glemser coached Rand, and further found that she consistently stated that "K.B." was one of the shooters. If Rand said "J.D." one time during her police interview, it seems to have been a mistake, perhaps because she was

nervous.

The trial court further rejected defendants' claim that errors in the State's transcription of Trusty's police interview obscured the fact that Rand did not tell Trusty that she witnessed the murders. It similarly rejected defendants' arguments that purported errors in the transcript of Langston's police interview undermined Washington's alibi. These particular findings all have ample support and we adopt them.

VII.

(Remaining Points)

All remaining points raised on appeal either lack sufficient merit to warrant discussion, R. 2:11-3(e)(2), or present novel jurisprudential or policy issues that are more appropriate for the Supreme Court or the Attorney General,[23] or both, to consider.

In reaching our determination today, we are very mindful of the passage of time and the serious proof difficulties the State faces if it chooses to proceed with a new trial. That is an unfortunate practical reality. But it cannot overcome

---

[23] In April 2019 the Attorney General's created a Statewide Conviction Review Unit and Statewide Cold Case Network, although the Attorney General has not indicated that these two cases are part of that review initiative.

the compelling reasons to grant defendants the relief they deserve.

We also recognize the well-respected judge who presided over the trial and the lengthy PCR proceedings lived with and labored over this case for over two decades. His insights are surely important. In fact, we have upheld in this opinion many of the judge's rulings. We appreciate the judge's faithful service and his long-standing feel for this case.[24] Nevertheless, our independent review of the record, in light of the newly discovered evidence, compels us to conclude it would be unjust to allow this verdict to stand.

## VIII.

### (Conclusion)

Defendants' convictions are consequently vacated for a new jury trial. We stay our decision, sua sponte, and any release of defendants from custody, for a period of sixty days to enable the State to seek relief from the Supreme Court if it so chooses. If such a filing with the Supreme Court occurs during the sixty-day interval, the stay automatically shall remain in effect unless and until the Supreme Court otherwise directs.

---

[24] The judge recently passed away. Nothing in this opinion or its outcome detracts from the judge's many years of dedicated and illustrious service to the public and the legal profession.

A-0716-17T3

Vacated and remanded for retrial.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION